MERCANTILE NATIONAL BANK AT DAL-
LAS et al. v. McCULLOUGH TOOL CO.
No. 10057.

Court of Civil Appeals of Texas. Austin.
July 9, 1952.

Rehearing Denied July 30, 1952.

Carrington, Gowan, Johnson & Walker by Hubert D. Johnson, Dallas, for appellant.

Fleming A. Waters, Cisco, R. R. Holloway, Brownwood, for appellee.

GRAY, Justice.

Appellee has filed a motion to dismiss this appeal and as grounds for dismissal says that the supersedeas bond filed by appellant is not sufficient as an appeal bond because: (1) it contains no obligation to pay the costs on appeal; (2) it is not conditioned in the manner and form required by law to have the effect of an appeal bond, and (3) there is no certificate by the district clerk estimating the costs in the court below and on appeal.

Appellee cites Rule 354 T.R.C.P., which prescribes the requirements for a cost bond on appeal.

The judgment appealed from is for $8,616.20 with interest as six per cent per

annum from date,—January 15, 1952, and costs. The costs accrued in the trial court amount to $416.50. The supersedeas bond filed by appellant is for $10,000, and is conditioned as is required by Rule 364(a), T.R.C.P. This bond bears the approval of the district clerk.

Appellant has requested and has been granted leave to file an additional bond. An additional bond for the sum of $900 has been filed and approved. Rule 365, T.R.C.P.

The bonds now on file are sufficient to meet the requirements of Rule 364(a), supra.

Rule 367, T.R.C.P.

Appellee's motion to dismiss the appeal is overruled.

Appellee sued Louis Burns, Mystic Oil Corporation (later called Mystic) and appellant to recover for personal services and materials furnished Mystic on an oil well designated as well No. 5 on the J. Wylie Green lease in Tom Green County. The services and materials were furnished from October 9, 1949, through January 12, 1950, and, as reflected by appellee's verified account, there was owing to appellee therefor $6,932.90. Appellee also sued to recover an attorney's fee.

Upon a nonjury trial appellee recovered judgment against Mystic and appellant, jointly and severally, for its debt, an attorney's fee for $1,250, interest and costs. Only appellant has appealed.

Some time in November, 1949, Mystic, acting by John Shanahan, its president, and Louis Burns, its vice president, began negotiations with appellant for a loan. On December 27, 1949, the loan was consummated and Mystic gave its note to appellant for $278,500 payable in monthly installments of $5,000 each, the first installment to become due January 20, 1950. This note was secured by a deed of trust covering an oil and gas lease on 497.32 acres of land in Tom Green County identified as the J. Wylie Green lease, and which lease was then owned or was being operated by Mystic. The deed of trust included rights then existing or to accrue under the lease and the oil runs. At the time of the execution of the note there were four wells drilled on the lease and the fifth (well 5) was being drilled. There were also accumulated oil runs.

Appellee alleged that a part of the consideration for the note and deed of trust was a promise by appellant to pay appellee the sum of $6,932.90 then due and to become due for services and materials furnished to Mystic on well 5; that such promise was made and exacted for the benefit of appellee; that appellant failed and refused to complete the disbursement of the loan and withheld approximately $80,000; that appellee had made demand on appellant for the payment of its debt; that payment was refused, and that it was necessary for it to employ an attorney. Appellee further alleged that Mystic was indebted to it at the time of the loan, that it extended credit and increased its credit to Mystic relying solely on the representations and promises of appellant that it was making a loan to Mystic and that a portion of such loan would be paid by appellant to appellee; that appellee relied on the representations and promises of appellant and did forego its right to file its statutory lien. Appellee also alleged that appellant induced Mystic to repudiate its obligations to appellee and so acted as to create a default by Mystic in its obligation to appellant, and that appellant through an agent and employee went into possession of the oil and gas lease in fraud of the creditors of Mystic, especially appellee.

The facts show that prior to the time that Mystic Oil Corporation was formed (early Fall of 1949) the J. Wylie Green lease was operated by Louis Burns and others under an agreement with the holder of the lease; that Burns was indebted to appellant, and that at the time the corporation was formed there had been three wells drilled on the lease and the fourth was being drilled, three of these wells (including number 4) were producers. Mystic took over the Green lease and consummated the loan with appellant as already noted. Appellant proceeded to disburse the loan and paid out the borrowed money to the creditors of Mystic to the extent of approximately $211,360 on January 13, 1950. Included in this amount was a debt of Louis Burns owing to appellant. On April 12,

1950, appellant filed suit on the note and to foreclose its deed of trust lien because of the failure of Mystic to pay the $5,000 installments due. At that time there was in appellant's possession the undisbursed portion of the loan, which the trial court found was $67,139.49. Also, there were uncollected oil runs which Mr. Pryor, appellant's vice president, said amounted to approximately $50,000.

During the negotiations for the loan and at the time it was consummated well 5 was being drilled. This fact was known to appellant, and Mystic was then indebted to appellee for services and materials furnished to the extent of $2,300 on that well. The existence of this indebtness was also made known to appellant.

Louis Burns testified, by deposition, that:

"59 What did you propose to the Bank that you would do with the money? A. The $278,000?

"60 Yes? A. Drill wells; that is what they loan money for; clean up our bills and keep drilling wells.

"61 Did they disburse to you the $278,000? A. No; they wanted to disburse the money; they had a man by the name of Holloway, Assistant Vice President, who would disburse this money, and it was agreed to by everyone of us to let him do it.

"62 That was agreeable to let him do the disbursing? A. Yes; as we needed it.

"63 Did you have an agreement with the Bank that this money was to be disbursed to your creditors? A. Yes; that was what we borrowed it for, to clean up what we owed and drill these wells. We borrowed the money to pay the people we owed and to drill more wells.

"64 Did the Bank agree to that proposition, that they would pay the bills that you owed and advance money for your drilling of other wells? A. That was my understanding.

\*　\*　\*　\*　\*　\*

"70 Did you furnish the Mercantile National Bank with a list of your creditors? A. Had an auditor to do that.

"71 Who was that auditor? A. Fred Bryant.

"72 Where does he live? A. In Brady.

"73 Did he make a list of all of your creditors? A. Yes.

\*　\*　\*　\*　\*　\*.

"A Yes; I talked to McCullough Tool Company, but I don't remember the name of Gray.

"96 But you talked to someone down there about these bills? A. Yes.

"97 And you told them you were getting a loan from the Mercantile National Bank? A. Yes, sir.

"98 And you told them that as soon as you got the loan, the Bank would pay the bill? A. Yes, sir.

\*　\*　\*　\*　\*　\*

"1 While ago you were asked with reference to the debts being paid by the Mercantile National Bank at Dallas; state whether or not they were to be paid out of the loan that you secured? A. Yes, that's right.

"2 It was not debts the Bank was to pay; but to pay your debts for you out of the money you borrowed? A. Yes; if we owed $278,000 in debts, they would pay it.

"3 You agreed with the Bank that they were to use the money from that $278,000 loan to retire your indebtedness? A. That's right.

"4 You did not intend to say that the Bank was to pay the indebtedness other than out of your own money that you had borrowed from the Bank? A. That's right."

Burns further said that prior to the time the loan was made the oil runs had not been paid because they had been unable to get a division order for the reason that there was an argument with the owner of the Green lease; that appellant would not make the loan without a division order; that before the loan was made a division order was secured and that it was delivered to appellant; that the first time he knew the division order was not "in tact" and that the money had not been sent to appel-

lant was after he was sued by appellant and then appellant told them the order had been lost, and that it was then too late to get another.

The note contained the following provision:

"In addition, the undersigned agrees that seventy-five percent (75%) of the oil runs and production accruing to it under its interest in the oil and gas leasehold estate on certain properties situated in Section 195, S. P. R. R. Company, District No. 11, in Tom Green County, Texas, which oil runs and production runs are being assigned to the Mercantile National Bank at Dallas to secure the payment of this note, may be applied by said Bank on the payment of principal and interest due under this note. It is agreed and understood that the monthly installments described in the preceding paragraph of this note are the minimum amounts to be paid and are to be paid unconditionally irrespective of whether or not the oil runs referred to in this paragraph amount to as much as the minimum monthly payment prescribed in the preceding paragraph.

"This note, to the extent of the amount mentioned herein, represents money this day borrowed by the undersigned from Mercantile National Bank at Dallas."

Fred Bryant testified that James Rankin (a vice president of appellant) and Louis Burns came to his office and requested him to prepare a schedule of Mystic's debts and forward the schedule to appellant; that he did so and that appellee was one of the listed creditors.

J. M. Gray, credit manager for appellee, testified that he communicated with appellant through Mr. Rankin relative to appellee's debt, and that Mr. Rankin told him that appellant was paying Mystic's bills on wells as they were completed as producers. He identified two letters which were introduced in evidence and are:

"Mercantile National Bank
at Dallas
Dallas, Texas
"Jas. H. Rankin December 30, 1949

Vice President
"McCullough Tool Company
P. O. Box 2575
Houston, Texas
"Gentlemen:
"In answer to your telegram regarding Mystic Oil Corporation, I wish to advise you that we are in the process of closing a loan on wells 1, 3 and 4, but from the record I looked at today, I think all your bills are on well 5.

"The company hopes to bring this well in within the next fifteen days, and if the well is satisfactory, we will make further disbursements which should include your accounts.

Yours very truly
/s/ Jas H Rankin
Vice President"

"Mercantile National Bank
at Dallas
Dallas, Texas
"Jas. H. Rankin February 9, 1950
Vice President

"Mr. J. M. Gray
McCullough Tool Company
P. O. Box 2575
Houston 1, Texas
"Dear Mr. Gray:
"With further reference to our telephone conversation of January 30, I wish to advise that I talked with the superintendent who is drilling the well for Mystic Oil Corporation and he told me it would be the latter part of this week before they would have the well ready for our geologist to make the tests. During the last few days they had some trouble with the pipe leaking and have this straightened out, and this should be a good well.

"The information is furnished you because I know you expected to receive your check by the end of this week.

Yours very truly,
/s/ Jas H Rankin
Vice President."

Mr. Rankin, after referring to the above letters and his conversation with Gray, testified:

"Q. Did you, in talking about Well No. 5 in your conversation with Mr. Gray, or in your letters, tell him what

was the basis of your information? A. I told him that the Company hoped to bring that well in within the next fifteen days, and if the well is satisfactory we will make further disbursements, which include their account."

The trial court filed findings of fact and conclusions of law, and, with other findings, found:

"At the time of the making of this loan it was discussed and agreed upon between Mr. H. M. Pryor and Mr. J. H. Rankin as officials of the bank and Mr. Louis Burns and Mr. John J. Shanahan as officials of the Mystic Oil Corporation that the purpose of making this loan, and a part of the consideration for making it, was that Mystic Oil Corporation had incurred indebtedness in the drilling of well 4, and was incurring expenses in the drilling of well 5, and that there would possibly be other wells drilled in which expenses would be incurred; that the Mercantile National Bank at Dallas was to loan to the Mystic Oil Corporation the amount of said note and the bank was to use and disburse the money for the purpose of paying off Mystic Oil Corporation's creditors who had furnished materials or labor or services of any character in the drilling of said wells with the limitation that before there was any obligation to pay for materials or labor or services in the drilling of any well that it must be a commercial producer, but that if any well drilled on said lease was a commercial producer then the bank would pay the creditors for material, services and labor used in the drilling of any such well, said payments to be made out of the $278,500.00 loan to Mystic Oil Corporation. This agreement to use and disburse the borrowed money for the use and benefit of such creditors was a part of the consideration for the making of said loan."

The trial court also found that well 5 was a commercial producer, and made further findings favorable to appellee.

Appellant's nine points are to the effect that the trial court erred in holding it liable to appellee because: The undisputed evidence shows that (1) appellant had no contract with appellee to pay it any amount of money; (2) appellant made no agreement for the benefit or appellee; (4) any agreement made by appellant to advance additional money to appellee or disburse additional loan funds in payment of appellee's creditors never became effective because of nonoccurrence of conditions precedent; (5) appellant was released from any obligation to make further advances to Mystic or its credit for the payment of its creditors by reason of defaults on the part of Mystic. (3) The overwhelming preponderance of the evidence shows appellant did not make any agreement for the benefit of appellee. (6) Appellant was not liable for more than nominal damages. (7) The statute of frauds is a bar to any action based on the alleged agreement. (8) Appellant was not liable for attorney's fees. And (9) certain special exceptions should have been sustained and not overruled.

 It is a well established rule of law that a contract entered into by parties for the benefit of a third party is binding and may be enforced by the third party. However for the third party, not named in the contract, to be entitled to enforce it he must show that it was made for his benefit and that he was the party intended to be benefited. United States Fidelity & Guaranty Co. v. Eubanks, 126 Tex. 405, 87 S.W. 2d 248; 10 Tex.Jur. Secs. 280–282, pp. 483–486. And where the contract has been accepted by the third party beneficiary it may not be modified or rescinded without his consent. 10 Tex.Jur. Sec. 283, p. 488.

 The testimony of Louis Burns shows the contract was made for the benefit of appellee. This testimony is corroborated by that of J. M. Gray, and by that of James Rankin whose testimony shows appellant's own interpretation of the agreement and, if the meaning of the agreement is uncertain, such interpretation is of great if not controlling weight. James Stewart & Co. v. Law, Tex.Sup., 233 S.W.2d 558, 22 A.L.R.2d 639.

There is evidence to support a finding that appellee not only accepted the contract but relied on it and did not file its statutory

lien which it was entitled to file and would have filed but for appellant's agreement, and that such forbearance in no wise would affect appellee's right to participate in the proceeds of the loan to the extent of its debt. The schedule of Mystic's indebtedness was forwarded to appellant by Fred Bryant on February 2, 1950, prior to the institution of foreclosure proceedings, and at a time when appellant had in its hands undistributed proceeds of the loan far in excess of the amount of money then due. In any event this was at a time Mystic was not in default as to the February installment and when disbursement of the loan had not been completed. Appellant had not, at the time appellee's account was payable, elected to foreclose the lien because of nonpayment of installments as is shown by the letter of February 9, 1950, supra. Even if it be said that appellee was in no better position to enforce the contract than Mystic, its enforcement was not precluded to appellee. In 9 C.J.S., Banks and Banking, § 395, at page 816, it is said:

"A bank must make such application of the proceeds of a loan as is agreed upon in the contract between it and the borrower, and is liable for a failure to do so."

Appellant appears to defend its refusal of payments to appellee on the ground that well 5 was not a commercial producer. The trial court found that it was.

Appellant had the burden of pleading and proving the defense. Rule 94, T.R.C.P.; McAnally v. Person, Tex.Civ.App., 57 S.W.2d 945; Gieb v. Goebel Brewing Co., Tex.Civ.App., 176 S.W.2d 975, error ref., w. o. m.; 10 Tex.Jur. p. 528, Sec. 305a.

Charles Hickox, who was not a licensed appraisal engineer but who had had twenty-five years experience in the oil business, who had been for many years production superintendent for Plymouth Oil Company and who was production superintendent for Mystic, said that well 5 was completed as a commercial producer and, by his tests, was producing approximately thirty-eight barrels of oil per day. The evidence shows that for a while the oil produced from the Green lease was delivered by truck to the Humble Pipe Line Company but later Republic Pipe Line Company "came in on the lease" and the oil was "run" by it. The record does not show the cost of marketing the oil from well 5 nor the price for which it was sold, neither does the record affirmatively show what meaning was attached to the term "commercial producer," —however, we think it is sufficiently clear that the term was used to mean that well 5 would produce oil in paying quantities. The trial court found the well produced oil in paying quantities. We think it reasonable to say that Charles Hickox who placed himself in position to know the costs of production and marketing conditions, took these matters in consideration when he said well 5 was a commercial producer. We are in no position to assume he did not.

H. M. Pryor, a vice president of appellent, said "they" began swabbing well 5 about February 1, 1950; that the initial flush production was thirty-seven barrels and that he did not know what the production was, "I could not get the records on it." He further said:

"Q. You have testified that it was not completed and did not go on production? That is, until in May? A. That's correct.

"Q. Are you still sure about that? A. It was not tested until May.

"Q. You are still sure that it was not completed until in May? A. It was not completed to produce until May.

 * * * * * *

"A. Well number five was completed—let me change that. Well number five was put on the swab sometime in late January, and the engineer—for some reasons known to themselves, they did not put a pump on it and called us for checking that well; and the pump was put on there—I believe it was March 6th.

 * * * * * *

"Q. Was it produced two months? A. At the end of May it was not producing hardly any.

"Q. By that time you had filed your law suit to foreclose this mortgage

hadn't you? A. I do not have the date we filed the suit.

"Q. April 12th is when you filed the law suit? A. All right.

"Q. What was it producing at that time? A. I don't know.

"Q. Is it true it was producing 38 barrels and that it continued producing that amount for several months? A. No.

"Q. Well, tell us when it fell off? A. The last was away off; by the end of May the whole lease was away off.

"Q. All of the wells? A. The whole lease—well five had dropped—

"Mr. Holloway: Did I understand you to say the lease had dropped off by the end of May? A. Yes.

"Q. Well, is it true the wells were not being operated and serviced properly? A. As far as I could find out— I didn't know anyone taking care of the lease. I went down there in May and again early in June and Hickox was angry with Burns; he said Burns owed him money and that he had to put up his personal funds to get material, and he had a man by the name of Mc-Donald who had not been paid.

"Q. Is a 38 barrel well a commercial producer? A. Not for sixty thousand dollars.

"Q. Is it a commercial producer? A. I would have to check it daily before I would operate it."

His further testimony was to the effect that it was his duty to determine whether appellant should advance funds on well 5, and that well 5 was not a commercial producer.

We attach no significance to what Pryor's duties were since the defense was to the effect that before the payment was to be made well 5 must be a commercial producer.

It does not appear that any time was fixed in which well 5 must have been completed. There are suggestions in the evidence of delays but there is no evidence that such delays were not reasonable. We think the question presented was simply whether the well was completed as a commercial producer. 10 Tex.Jur. Sec. 237, p. 413.

Appellant's points 1, 2, 4 and 5 assert that the evidence in support of the contentions thereby made is undisputed. For this Court to sustain those points it would be necessary for us to say that such evidence is not at variance with the facts as testified to by other witnesses, the circumstances of the case and the reasonable inferences to be drawn from such other evidence and circumstances. Ironside v. Ironside, 188 Okl. 267, 108 P.2d 157, 134 A.L.R. 621.

The testimony of Mr. Rankin and Mr. Pryor, both Vice Presidents of appellant, cannot be said to be conclusive. They were interested witnesses and their credibility and the weight to be given their testimony was for the trial court. Scott v. Gardner, 137 Tex. 628, 156 S.W.2d 513, 141 A.L.R. 50; Flack v. First Nat. Bank of Dalhart, 148 Tex. 495, 226 S.W.2d 628; Head v. Scurr, Tex.Civ.App., 8 S.W.2d 819, error dism. This rule is applicable to the testimony of interested lay witnesses and, also, to testimony given as the opinion of experts. Nass v. Nass, Tex.Sup., 228 S.W.2d 130; Bridwell v. Bernard, Tex. Civ.App., 159 S.W.2d 981, error ref. w. o. m.; Guinn v. Coates, Tex.Civ.App., 67 S.W.2d 621.

Appellant's point 3 cannot be sustained. The trial court resolved the weight and the credibility of evidence before him and from his estimate of the effect of such evidence he gave probative value to that favorable to appellee. This result reached by the trial court from all the evidence before him (that which was favorable as well as unfavorable to appellee) is controlling here. San Antonio Traction Co. v. Higdon, 58 Tex.Civ.App. 83, 123 S.W. 732, error ref.; Andrews v. Fuller, Tex.Civ.App., 186 S.W. 275.

Appellant says the measure of appellee's damage is in any event damages for the breach of a contract to lend money. We disagree with this view. Appellee's cause of action is for compensation for the loss it sustained because of appellant's

refusal to perform the agreement. The alleged agreement placed appellant in the position of one who assumes the payment of a note and made appellant liable for the payment of the debt. 6 Tex.Jur. Sec. 109, p. 729; 13 Tex.Jur. Sec. 15, p. 84. Appellee is entitled to be placed in the position it would have been in if appellant had performed its promise, and is entitled to recover in damages the equivalent of its loss. 25 C.J.S., Damages, § 79, p. 585.

The agreement alleged by appellee was an original promise and was not within the statute of frauds. Waggoner v. Herring-Showers Lumber Co., 120 Tex. 605, 40 S.W.2d 1; Bank of Garvin v. Freeman, 107 Tex. 523, 181 S.W. 187; Goldstein v. Union Nat'l Bank, Tex.Civ.App., 216 S.W. 409.

Article 2226, Vernon's Ann.Civ.Stat., provides:

"Any person having a valid claim against a person or corporation for personal services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express or stock killed or injured, may present the same to such person or corporation or to any duly authorized agent thereof; and if, at the expiration of thirty (30) days thereafter, the claim has not been paid or satisfied, and he should finally obtain judgment for any amount thereof as presented for payment to such person or corporation, he may also recover, in addition to his claim and costs, a reasonable amount as attorney's fees, if represented by an attorney."

Appellee's claim was for services rendered and materials furnished to Mystic. These were not furnished to appellant. To allow appellee to recover the statutory attorney's fee against appellant would require a liberal construction of the statute which is penal in nature and must be strictly construed. To claim the benefit of the statute appellee is required to bring himself strictly within its provisions. First Texas Prudential Ins. Co. v. Long, Tex. Com.App., 46 S.W.2d 297. It is our opinion that appellee has not brought itself within the terms of the statute, and that its recovery of an attorney's fee against appellant cannot be sustained.

Appellant urged special exceptions to specific paragraphs of appellee's pleadings on the grounds that such paragraphs were vague, indefinite, stated conclusions, and did not inform appellant of the charges made against it. The trial court heard the exceptions but withheld a ruling thereon until the conclusion of the trial and then overruled them.

No abuse of the discretion of the trial court or injury to appellant resulting from his ruling has been shown. The ruling should not be disturbed. Southern Underwriters v. Hodges, Tex.Civ.App., 141 S.W. 2d 707, error ref. Further, we think an examination of appellee's entire pleading and the record refutes any argument that injury resulted to appellant because of the ruling.

That portion of the trial court's judgment awarding appellee a recovery of $1250 attorney's fee and interest thereon is reversed and judgment is here rendered denying appellee recovery of attorney's fees. In all other respects the judgment is affirmed.

Reversed and rendered in part and in part affirmed.

HUGHES, Justice (dissenting).

I respectfully dissent because, in my opinion, there is nothing in the transactions between the Bank and the Tool Company nor in the transactions between the Bank and Mystic to create liability of the Bank for Mystic's debt to the Tool Company.

#### The Bank and the Tool Company

James M. Gray, Credit Manager of McCullough Tool Company, testified that in October, 1949, the company began selling to Mystic Oil Corporation. At that time he wrote "One of our usual credit inquiries, a stereotyped form letter" to appellant, Mercantile National Bank of Dallas.

This inquiry was not answered by the Bank up to November 29, 1949, when Mr. Gray again wrote the Bank concerning

Mystic and its Vice President, Mr. Burns, from which letter I quote:

"Fearing that our letter to you of October 27, may have gone astray in the mails, we are writing again to request the benefit of your experience and information pertaining to the above.

\* \* \* \* \* \*

"Mr. Burns is identified we understand with the Mystic Oil Corporation of Brady, Texas, which opened an account with us in October 1949 and which has settled the initial transaction promptly. From the meager information thus far obtained, we feel that Mr. Burns is a responsible business man, but for the completion of our confidential records we would greatly appreciate whatever you can add as to his character and financial responsibility as we wish to be in a position to serve this mutual customer's interest fully."

This letter was answered by the Bank on November 19, 1949, as follows:

"McCullough Tool Company
P. O. Box 2575
Houston, Texas

"Attention Mr. J. M. Gray

"Gentlemen:

"Your letter of November 11th has not been answered because we have been trying to get some information regarding the Mystic Oil Corporation of Brady, Texas, which we understand is owned by a Mr. Shanahan and Mr. Louis Burns. The information we have now is that they have several wells and they have requested us to send our geologist out to make a report on the wells as they desire to make a loan in connection with the properties. Mr. Louis Burns of Brady, Texas, has been doing business with us for a number of years, having been in the machinery business, and we have loaned him on a secured basis and he has a contingent liability on a number of notes where he has sold machinery

and we are carrying the notes. Just as soon as we are in a position to give you additional information on the Mystic Oil Company, we shall be happy to do so.

"Yours very truly,
/s/ James H. Rankin
Vice President."

Credit Manager, Mr. Gray, diligently pursued the Bank further as shown by his following testimony:

"Q. Now, subsequent to that time, (November 19) did you have any telephone conversations with Mr. Rankin? A. Yes; I did.

"Q. Do you now remember what date you had the first telephone conversation with him? A. It seems to me that it was during December sometime—sometime in December of 1949.[1]

"Q. Will you tell the court the gist of that conversation? A. The gist of it was that the Mercantile National Bank was taking a deed of trust on the various properties of the Mystic Oil Corporation to cover all of the wells producing or would be producing, and contemplated making advances to the Mystic Oil Corporation for the payment of their bills and obligations incurred in connection with their Tom Green County oil development.

"Q. Was that the J. Wiley Green lease? A. Yes; the Green Number Five was the well that we were interested in; and I understood from that conversation they included that well the same as the others.

"Q. Subsequent to that telephone conversation and before the 30th of December, did you have another occasion to communicate with Mr. Rankin? A. I did.

"Q. Did you send him a telegram? A. I did."

The telegram referred to was dated December 28, 1949, and reads:

"Mystic Oil Corporation owes us $2,300, our limit unless arrangements to finance through your bank are mate-

---

1. The call was made by Mr. Gray.

rializing satisfactory. Please write us in confidence. McCullough Tool Company, J. M. Gray."

The Bank did not reply to this telegram immediately but Credit Manager, Mr. Gray, was not to be shaken. He telephoned the Bank and according to him his conversation with Mr. Rankin was:

"Well, he told me that the deed of trust—I believe he told me the deed of trust had been executed and that everything was going along satisfactorily and that a number of the bills on completed wells had been paid; that the Mercantile National Bank was paying these bills as the wells were completed as producers."

On December 30th, the Bank did answer the telegram by a letter set out on page 7 of the majority opinion [250 S.W.2d 874] I repeat, for emphasis, the concluding paragraph of that letter:

"The company hopes to bring this well in within the next fifteen days, and if the well is satisfactory, we will make further disbursements which should include your accounts."

Subsequent to December 30, Mr. Gray testified that he had telephone conversations with Mr. Rankin on January 16, 1950, January 23, and January 30, all initiated by Mr. Gray.

Before these conversations occurred Mystic's account with the Tool Company was complete as the last item charged thereto was dated "1–12–50."

The substance of the conversations on the 16th and 23rd was that well No. 5 had been reported a good producer and "that it looked like everything would work out satisfactorily and that we would get our money."

The conversation of the 30th was, as reported by Mr. Gray:

"When I talked to him, he said they had looked through their files and did not seem to have copies of all of our bills, and he wanted all our bills sent in so they would be sure and have them; he told me to send them in and we would get our money."

Mr. Gray sent the Bank the bills mentioned but received no response thereto from the Bank.

On February 9, 1950, the Bank wrote the letter set out on page 7 of the majority opinion.

The above is the sum and substance of all transactions between the Bank and appellee.

To me, these transactions mean this and no more: Mr. Gray is a very aggressive and persistent Credit Manager. Mr. Rankin is a very courteous and accommodating Bank official.

My conclusion is that these transactions form no basis for liability of the Bank for Mystic's bad account with the Tool Company.

### The Bank and Mystic

In considering the transactions between Mystic and the Bank, it should be borne in mind that the only concern which the Tool Company has in these matters is to establish, if it can, an enforceable contract on the part of the Bank to pay Mystic's debt to it.

Since it is not contended that the Bank executed a written contract to pay Mystic's debt to the Tool Company, the evidence must show not only that the Bank agreed to pay the debt but that in so doing the Bank agreed to pay its *own* debt, otherwise the promise is within the Statute of Frauds. Spann v. Cochran & Ewing, 63 Tex. 240.

In addition to the evidence referred to in the majority opinion I desire to quote the uncontradicted testimony of Mr. H. M. Pryor, Senior Vice President of the Bank, who was in active charge of the loan to Mystic, explaining the amount for which the note was made.

"Well that goes back to about December 20th when Mystic Oil Corporation was applying for an oil production loan; at that time they did not have a pump for Well number four, and before we could determine how much we would loan them on one, three, and four, it was necessary to advance four thousand dollars for that pump and well number four was put

on production, and we were not able to check number four until some time along in January; so we could not determine how much we would loan on one, three, and four, Shanahan was in Texas at the time; he is a resident of Massachusetts, and he wanted to go home, and he asked that we write the loan for a total of what they estimated would be necessary for wells one, three, four, and five; so he asked that we make it enough for the full amount, so he would not be involved with another note and another trip down here."

Mr. Shanahan was Mystic's President and the only officer who executed the note in its behalf.

Both Mr. Rankin and Mr. Pryor denied that either of them or the Bank ever made an agreement to pay Mystic's debt to the Tool Company.

The record shows that the $211,360.51 disbursed by the Bank on January 13, 1950, was done so upon written instructions from Mystic. The manner of accomplishing this disbursement was by placing such amount of money to the credit of Mystic and issuing cashier's checks against such account.

Mystic never did instruct the Bank to pay the Tool Company.

The full face of the note was never deposited to Mystic's account or paid to it ·or for its benefit. There never was any of Mystic's money in the Bank out of which the Tool Company's debt could be paid.

If the Bank has breached its contract to lend Mystic the face amount of the note that is a matter between Mystic and the Bank and with which the Tool Company and this Court has no concern.

In arriving at the full and true meaning of the transaction between Mystic and the Bank these rules of law are applicable and must be considered:

"Parties are presumed to contract for themselves. It follows that a contract will not be construed as having been made for the benefit of a third person unless it clearly appears that such was the intention of the contracting parties." Citizens National Bank in Abilene v. Texas & Pacific Railway Co., 136 Tex. 333, 150 S.W.2d 1003, 1006.

"One claiming to be a third party beneficiary under a contract alleged to have been made for his benefit cannot recover thereon merely because he will be incidentally benefited by its performance. He must be a party to the consideration or the contract must have been entered into for his benefit, 13 C.J. 709, sec. 817, and he must accept it as made and must succeed or fail upon its terms." Price v. Lee, Tex.Civ.App., 119 S.W.2d 673, 675 (Waco, writ denied.)

"An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." Restatement of the Law of Contracts, Sec. 147, which gives the following illustration on page 155:

"B promises A for sufficient consideration to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If, on a fair interpretation of B's promise, the amount of the debts is to be paid by B to C, D and E, they are creditor beneficiaries; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries."

I have no difficulty in concluding that, under this record, the Tool Company was at most, an incidental beneficiary.

The Bank made a loan to Mystic for a purpose. This purpose was to enable Mystic to pay its debts and drill other wells. The amount of the loan was large and, in the exercise of caution and prudence, the Bank made the disbursements itself rather than turn the money over to Mystic for distribution. The money was disbursed by the Bank in accordance with written instructions from Mystic.

There is no evidence which I can find which even suggests that the Bank assumed

payment of the Tool Company debt or that the Bank made such debt its own.

A fair interpretation of the agreement between the Bank and Mystic is that the primary motive of the Bank was to make a good loan and the primary motive of Mystic was to stay in the oil business. Benefits conferred by this agreement upon creditors of Mystic were derivative only and did not make them "creditor beneficiaries." Williston on Contracts, Vol. 11, Sec. 402, p. 1157.

There is yet another matter which, in my opinion, precludes recovery by the Tool Company.

Assuming that the Tool Company was a third party creditor beneficiary then it must accept the contract as made. This contract was, at the most, that the Bank would pay the cost of drilling well No. 5 only in the event that it was satisfactory to the Bank or was a "commercial producer."

It is obvious that the well was not satisfactory to the Bank because it refused to pay for its drilling.

Was the well a "commercial producer"?

The trial court found "that before there was any obligation (on the part of the Bank) to pay for materials or labor or services in the drilling of any well that it must be a commercial producer. * *"

The lower court further found that the Bank had on hand more than sixty-seven thousand dollars which was to be used in paying expenses in connection with well No. 5, "provided well 5 was a commercial producer, that is, *produced oil in paying quantities.*"

The court's definition of a "commercial producer" is plucked out of thin air. There is no evidence to authorize the court's definition.

The court found that well No. 5 was brought in for 38 barrels per day and that it was a commercial producer, "that is, that it would produce oil in paying quantities."

The majority say that the record does not "affirmatively show what meaning was attached to the term 'commercial producer,'

however, we think it is sufficiently clear that the term was used to mean that well No. 5 would produce oil in paying quantities."

"The words 'paying quantities' as used in an oil and gas lease have received judicial construction and application. They mean that the oil and gas discovered must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses. If the well does this, it is producing in 'paying quantities,' though it may never repay the cost of drilling." 31A Tex.Jur. p. 242–3.

It is simply incredible to me that the Bank or any sane person would make an agreement to lend the cost of drilling a well on condition only that the well would pay the cost of producing the oil but without regard to the cost of drilling it. At any rate there is no evidence that the Bank made such an agreement.

The record is far from satisfactory concerning the potential of well No. 5. The record does show that it came in for 38 barrels per day; that production fell off sharply within a very short time and that by the end of May Well No. 5 was "away off" and was producing "hardly any."

The cost of drilling well No. 5 was "well over $90,000.00."

A "commercial producer" in the sense used by the parties herein must have meant a well which with reasonable probability would produce enough oil to pay within a reasonable time the entire cost of drilling and operating the well.

I also disagree with the majority holding that the burden of proof was on appellant to prove that well 5 was not a commercial producer. The burden of proof was on appellee to prove that it was entitled to recover under the terms of the contract made between the Bank and Mystic. Appellee concedes that one of the conditions of this contract was that well 5 be a "commercial producer." It was therefore its duty to establish this as a fact. This the Tool Company wholly failed to do.

I would reverse.