E. T. FLACK ET AL V. FIRST NATIONAL BANK OF DALHART, TEXAS.

No. A-2346. Decided January 18, 1950.
Rehearing overruled February 22, 1950.
(226 S. W., 2d Series, 628.)

*Dennis Zimmerman,* of Tulia, Texas, *James W. Witherspoon, Mel Ruth Aikin* and *John D. Aikin,* all of Hereford, Texas, and *Dan Moody,* of Austin, for petitioners.

It was error for the Court of Civil Appeals to hold that there was no evidence of probative value to sustain the findings of the jury that the bank had notice of sufficient facts that would reasonably or by the use of diligence disclosed the interest of the petitioners in the cattle in controversy. College Park Electric Belt Line v. Ide, 40 S. W. 64; 9 Texas Jur. 185, sec. 79; Hamilton Natl. Bank v. Harris, 260 S. W. 318.

*Jennings & Evans,* of Tulia, Texas, *Morgan Coulton, Morgan & Brittain* and *L. A. White,* all of Amarillo, Texas, for respondents.

Since there was no evidence of any fact or combinations of facts known to the bank to excite an inquiry, the pursuit of which would have disclosed the interest of petitioners in the cattle, there was no evidence to support the verdict of the jury. Brooks v. Asherton State Bank, 278 S. W. 473; 31 Texas Jur. 365.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

This suit involves a question of priority of mortgages. Petitioners and one Quincy Reeves about February 1, 1946, purchased from one Gordon Wicks at Clovis, New Mexico, about 179 head of Black Angus cows and some calves and which included the cattle covered by the mortgages in this suit, petitioners paying for one half of the cattle and Reeves paying for the other one half. After selling off approximately 60 head, the remaining cattle were placed on a pasture belonging to one Walton and located near Raton, New Mexico and in Colorado. Walton was to look after the cattle and he, representing petitioners, and Reeves were to divide the cattle so as to segregate the common ownership into individual ownership in particular animals in Flack and Wier of one half and Reeves of one half. None of the cattle were in Walton's brand, but about 135 of them were branded with a quarter circle Lazy G ꙅ or a MO on the right hip. About April 13, 1946, Walton and Reeves contacted Mr. Woods of respondent Bank regarding a loan of money to purchase a grass lease in Colorado. Reeves was a regular customer of the Bank, but Walton was not known to the Bank. The Bank made Walton a loan of about $4700.00 on said date to pay for an individual grass lease, but before making the loan required Walton to give to the Bank a sworn financial statement. In this statement Walton swore that he then owned the particular 86 Angus cows involved in this suit subject to mortgage to the First National Bank of Raton to secure an indebtedness of $5600.00 due July 1946. This $4700.00 loan was repaid to the Bank in due time and is not in the present suit. Prior to April 23, 1946, Walton approached Woods of respondent Bank with regard to borrowing some $12,000.00 additional money with which to pay off the Raton bank and pay the purchase price for 74 Hereford cattle, and offered as security for this loan a total of 247 head of cows and calves which included the 86 Angus cows involved in this suit. Mr. Woods, on April 22, 1946, inspected the cattle offered by Walton as security for

this loan, and on such inspection he found out that none of the Angus cows were branded bar RW on the left hip ($\overline{\text{RW}}$) as represented by Walton, and also found out that Quincy Reeves owned an undivided 1/2 interest in the 86 Angus cows and that Walton did not own any particular Angus cow of the 86. As a matter of fact, Walton owned no interest in said 86 Angus cows but the other 1/2 interest was owned by petitioners. Woods testified that Walton promised to brand the cows. Woods did not question either Walton or Reeves about the ownership of the cows, but accepted a mortgage from Walton on the 86 Angus cows, showing Walton was the owner of all interest in the 86 cows. On April 23, 1946, Woods for respondent Bank made a loan to Walton of approximately $12,000.00 taking Walton's note due May 13, 1946, secured by Walton's chattel mortgage on the total of 247 head of cattle including these 86 Angus cows. This mortgage was duly filed for record in Las Animas County, Colorado, where the cattle were located. May 13, 1946, the note and mortgage were renewed and extended to come due November, 1946. Walton owned no interest in these cows whatsoever until July 1, 1946. Prior to this date the cattle had been divided by Walton and Reeves and petitioners received the 86 Angus cows in the division. Also, some month or more prior to July 1, 1946, Walton, without the knowledge or consent of petitioners, had put his $\overline{\text{RW}}$ on the left hip of the cows. Flack lived in Illinois and, he was looking after petitioners' interest in these cattle, saw them July 1, 1946, with Walton's brand on them and as result of negotiations with Walton, sold the 86 cows to Walton on credit taking Walton's conditional sale contract for $10,183.16 due January 1, 1947. This contract was never filed for record or registration by petitioners. Petitioners knew nothing of Walton's dealing with respondent until sometime in April, 1947, and just a few days before this suit was filed by petitioners. Respondent Bank renewed its note and mortgage from Walton November 30, 1946, January 21, 1947, and February 26, 1947, and all mortgages taken were promptly filed for record in the proper county. The 86 Angus cows were moved to Swisher County, Texas, prior to November 30, 1946, and remained there until sold and the proceeds placed in escrow to await the outcome of this litigation. The Bank had no actual knowledge of the conditional sale contract until April, 1947, and just a few days prior to the filing of this suit. The case was tried before a jury who found in answer to special issues submitted (1) that Charles Woods had notice of facts putting him on inquiry which would have disclosed the facts as to the petitioners' ownership of the cattle; (2) that petitioners did not permit Walton to possess and handle the cattle in such manner

as to induce a reasonably prudent business man to believe that he had authority to mortgage the cattle; (3) that petitioners and Walton were not partners in the ownership of the cattle; and (4) that petitioners were sole owners of the cattle from the date of purchase to date of execution of conditional sales contract. Upon this verdict, the trial court rendered the judgment as set out in the Court of Civil Appeals opinion, which was for petitioners for the amount of their debt, and directed the proceeds of the sale so applied. Upon an appeal duly perfected, the Amarillo Court of Civil Appeals reversed and rendered the cause for respondent, holding there was no evidence to support the jury's finding as to notice and that the trial court should have given an instructed verdict for respondent. 222 S. W. (2d) 455. We granted petitioners' application for writ of error, and the cause is properly before us for decision.

■ We have concluded that the trial court was correct in submitting the issue as to notice and that there is evidence to support the jury's verdict and therefore the Court of Civil Appeals erroneously reversed and rendered the cause. This conclusion makes unnecessary any discussion of the other points raised by petitioners.

■ The holding of the Court of Civil Appeals that there was no evidence to support the issue and that the trial court should have given an instructed verdict for the respondent, raises a question of law, and it becomes our duty to decide if there was *any* evidence to support the jury finding. 3 B. Tex. Jur. p. 476, note 11, Appeal and Error, Sec. 946, and authorities cited therein.

■ "Notice may be broadly defined as information concerning a fact actually communicated to a person by an authorized person, or actually derived by him from a proper source, or else presumed by law to have been acquired. The latter (presumed) information is regarded as equivalent in legal effects to a full knowledge, and to it the law attributes the same consequences as would be imputed to knowledge. Notice as thus defined is not always synonymous with 'knowledge' or 'information' as commonly understood, for in law a person may be held to have notice of something about which he has no actual knowledge or information." Sec. 2, 31 Tex. Jur., p. 358, 1st par.

■ "Notice, as said above, may be either actual or constructive. 'Actual notice' literally means express or positive personal information or knowledge directly communicated to the person to

be affected. In a more comprehensive sense, the term also embraces knowledge of all those facts which reasonable inquiry would have disclosed, the duty of inquiry extending only to matters that are fairly suggested by the facts really known. In other words, whatever fairly puts a person upon inquiry is actual notice of the facts which would have been discovered by reasonable use of the means at hand." Sec. 3, 31 Tex. Jur., pp. 359-60.

"Whatever puts a person on inquiry ordinarily amounts in law to notice, provided inquiry has become a duty and would lead to knowledge of the facts by the exercise of ordinary diligence and understanding. In other words, one who has knowledge of such facts as would cause a prudent man to make further inquiry, is chargeable with notice of the facts which, by use of ordinary intelligence, he would have ascertained. As the rule has been more precisely stated, 'knowledge will be imputed and may be implied from circumstances where the circumstances known to one concerning a matter in which he is interested are sufficient to require him, as an honest and prudent person, to investigate concerning the rights of others in the same matter, and diligent investigation will lead to discovery of any right conflicting with his own.

"In such circumstances the person sought to be charged with notice is presumed to have knowledge of all that might have been discovered by investigation; that is to say, he is presumed to know whatever, by the diligent use of what information he has, and of the means in his power, he ought to know. Responsibility in such circumstances is the same in all respects as if the person sought to be charged actually knew, and he will not be heard to allege ignorance. As was said by Mr. Justice Jackson in a recent case, 'He is not warranted in shutting his eyes against the lights before him.' Means of knowledge, with the duty of using them, are thus deemed the equivalent of knowledge itself." Sec. 4, 31 Tex. Jur., pp. 362-365.

"Notice in law is of two kinds—actual and constructive. These descriptive terms need but little explanation. In common parlance 'actual notice' generally consists in express information of the fact, but in law the term is more comprehensive. In law whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained. Means of knowledge with the duty of using them are in equity equivalent to knowledge itself. Where there is a duty of

finding out and knowing, negligent ignorance has the same effect in law as actual knowledge. So that, in legal parlance, actual knowledge embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed. Actual notice is always a question of fact. 20 R. C. L. p. 340." Hexter v. Pratt, 10 S. W. (2d) 692. (Com. of App.)

We have carefully read over the statement of facts, and, without quoting therefrom, we believe that there is evidence raising for a jury decision the question of notice to the Bank of petitioners' rights. The only witness for the Bank on the question of notice was the witness Charles Woods, its president. He testified that in making cattle loans he usually checked the brands on the cattle and tried to check the records, too; that cattle brands meant something, and if cattle did not have a man's brand (who was claiming to own the cattle), that makes one wonder about it, and that where a man is showing cattle (as collateral to a loan) that he has claimed to own for some time and that are still unbranded, this fact would make one wonder more. After Walton had made a financial statement claiming to own the cattle, Woods, on inspection of the cattle found that Walton did not own outright any individual animal, and also found out that Quincy Reeves owned an interest in the cattle, which interest was said to be an undivided one-half interest. Woods was informed that the First National Bank of Raton had a mortgage on these Angus cows which Walton claimed to own, and which Walton represented he was clearing of the Raton Bank's mortgage with a part of the proceeds from respondent's loan. Woods knew where the mortgage was recorded and demanded a release of this mortgage and debt and he secured from the clerk at Raton an abstract showing that the respondent's lien was the only lien against the 247 odd cattle covered by respondent's motgage, yet Woods did not ascertain the description of the cattle in the Raton Bank mortgage. Had he secured a copy of the mortgage to the Raton Bank, it would have shown that Walton had not mortgaged the Angus cows to the Raton Bank. Woods inquired of Watson regarding the prior ownership of the 74 odd Hereford cattle which Walton was buying, and which were also mortgaged to secure the loan but did not inquire about the prior ownership of the Angus cattle. We believe the above testimony from Woods raised a jury issue, and the trial court was correct in submitting such issue to the jury.

Woods was the president of respondent Bank, and the only witness testifying for the Bank regarding its dealings with Walton. He was an interested witness, and the jury had the opportunity of observing him and having held that there was sufficient evidence to go to the jury on the issue of notice to the Bank, we feel that the jury was entitled to pass upon the circumstances surrounding this loan and to make the inferences logically deducible from such circumstances.

■ "As to the testimony of interested witnesses, the general rule is that, while the jury has no right arbitrarily to disregard the positive testimony of unimpeached and uncontradicted witnesses, the mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury. Stated in another form, the rule is that the uncontradicted, uncorroborated testimony of a party to a suit will not authorize or support an instructed verdict." Simmonds v. St. Louis B. & M. Ry. Co., 127 Texas 23, 27, 91 S. W. 2d 332, 333; Pope v. Beauchamp, 110 Texas 271, 280, 219 S. W. 447; Sonnentheil v. Christian Moerlein Brewing Company, 172 U. S. 401, 19 Sup. Ct. 233, 43 L. Ed. 492; 495; Mills v. Mills, Tex. Com. App., 228 S. W. 919; Burleson v. Tinnin, Tex. Civ. App., 100 S. W. 350, application for writ of error refused; Traders & General Insurance Co. v. Milliken, Tex. Civ. App., 87 S. W. 2d 503, 505.

"The plaintiff's testimony, the substance of which has been hereinbefore stated, is not so clear, positive and unequivocal upon the point at issue and of such nature and given under such circumstances as to bring it within the exception to the above quoted rule and authorize the trial court to give conclusive effect to it. Great Southern Life Insurance Company v. Dorough, Tex. Civ. App., 100 S. W. 2d 772, 775, 776; Springfield Fire & Marine Insurance Company v. Wm. Cameron & Company, Tex. Civ. App., 96 S. W. 2d 788; Simonds v. Stanolind Oil & Gas Company, 134 Texas 332, 114 S. W. 2d 226, on rehearing 134 Texas 348, 136 S. W. 2d 207, 208; Traders & General Insurance Co. v. Milliken, Tex. Civ. App., 87 S. W. 2d 503, 505." Texas Employers' Ins. Ass'n v. Roberts, 139 S. W. (2d) 80.

We do not believe the testimony of the witness Woods comes within the exception to the above general rule as such exception is set out by the Commission of Appeals in McGuire v. City of Dallas, 141 Texas 170, 170 S. W. (2d) 722, 728.

■ Our holding that there was evidence to require the submission of the issue to the jury, and their findings on such special issue determines that respondent is not entitled to protection as a bona fide mortgagee under Arts. 5489, 5490 and 6645, Vernon's Texas Civil Statutes, 1925, as amended. Therefore, petitioners' conditional sale contract has priority over respondent's chattel mortgage lien and the trial court's judgment was a correct one.

The respondent having no assignment in the Court of Civil Appeals raising the insufficiency of the evidence to support the jury's verdict, the judgment of the Court of Civil Appeals is reversed, and that of the trial court is in all things affirmed.

Opinion delivered January 18, 1950.

Rehearing overruled February 22, 1950.