T–VESTCO LITT–VADA, et al., Appellants,

v.

LU–CAL ONE OIL COMPANY, et al., Appellees.

William CLASSEN, et al., Appellants,

v.

LU–CAL ONE OIL COMPANY, et al., Appellees.

Nos. 13507, 13509.

Court of Appeals of Texas, Austin.

March 30, 1983.

Rehearing Denied May 11, 1983.

Robert J. Hearon, Jr., Graves, Dougherty, Hearon & Moody, Austin, George T. Dunn, Fielder & Fielder, Lockhart, for appellants.

Roy G. Scudday, Fielder & Scudday, Lockhart, for appellees.

Before PHILLIPS, C.J., and POWERS and GAMMAGE, JJ.

POWERS, Justice.

Appellants are numerous corporations, limited partnerships, and natural persons. Their number is so great that they will not be named in this opinion. Appellees are five limited partnerships: Lu-cal One Oil Company, Lu-cal Two Oil Company, Lu-cal Three Oil Company, Lu-cal Four Oil Company, and Lu-cal Five Oil Company.

Appellees sued appellants, alleging a formal action in trespass to try title, seeking title and possession relative to the working or operating interest under two oil and gas leases in lands situated in Caldwell County, Texas. Tex.R.Civ.P.Ann. 783–809 (1967). They also claimed money damages for, among other things, wrongful execution and interference with contract. Appellants answered with pleas of not guilty, special defenses, special denials, and a general denial. They alleged in addition a counter-claim seeking declaratory relief in the form of a judgment which validated their title and right to possession under the two oil and gas leases, together with an alternative claim for money damages as reimbursement for sums expended by them in operating the leases.

Trial was before the court sitting without a jury. The trial court rendered judgment awarding appellees title and possession of the working or operating interest, together with money damages and costs of court. The trial court made findings of fact and conclusions of law which will be mentioned hereafter when pertinent to the point under discussion.

The common source of title to the mineral estate is agreed to be Oil and Gas Minerals Development Corporation (OGMD). We do not find in the record the original oil and gas leases in issue. Nevertheless, the respective positions of appellants and appellees depend upon a previous severance of the mineral and surface estates, for both claim title to the former, which we presume to be a determinable fee estate as typically created in the standard oil and gas lease. *Stephens County v. Mid-Kansas Oil and Gas Co.*, 113 Tex. 160, 254 S.W. 290, 295 (Tex. 1923).

We do find in the record on appeal five exhibits introduced by appellees which purport to be bilateral contracts between appellees and OGMD, made in November and December 1971. The form of these contracts is the same in the parts important to the present appeal and we have, accordingly, quoted in a footnote the material parts of one of them.[1] Appellees claim these instruments to be the source of their title,

---

1. The first such instrument provides in part as follows:

   THIS AGREEMENT made the 22nd day of November, 1971, by and between Oil, Gas and Minerals Development Corporation, a Nevada corporation, ... (hereinafter referred to as "OGMD") and LuCal-One Oil Company, a limited partnership.... (hereinafter referred to as "Purchaser");

   WITNESSETH

   WHEREAS, OGMD is the owner of oil and gas leases with respect to certain properties, copies of which leases are attached hereto as Exhibit "A", herewith;
   WHEREAS, OGMD is willing to sell and assign all of its right, title and interest in and to certain of such leases to Purchaser on the terms and conditions hereinafter set forth; and

albeit an equitable title only, which was later merged with the legal title as a result

of additional conveyances made subsequent to appellants' recordation in Caldwell Coun-

WHEREAS, OGMD is willing to drill for Purchaser certain oil wells all as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and conditions hereinafter contained it is hereby agreed as follows:

Section 1.

### ASSIGNMENT

(a) OGMD hereby assigns and conveys unto Purchaser all of OGMD's right, title and interest in and to four (4) drill sites to be selected by OGMD at its sole discretion from locations on the real property described in Exhibit A. OGMD shall notify purchaser in writing of the exact location of each drill site prior to commencing drilling operations on the sites specified. Each drill site will be plainly marked by OGMD.

(b) OGMD hereby warrants that it has good title to the leasehold interests being assigned, free and clear of all liens, claims and encumbrances of persons holding by or through OGMD, and that its interest in the underlying lease is not less than an 8125000 [sic] working interest. Unless otherwise directed by Purchaser, OGMD shall hold title to the properties sold to Purchaser under this Agreement, as nominee of Purchaser, subject always to the right of Purchaser at any time to demand the recordation of title in the name of Purchaser or in such other name as Purchaser may designate.

(c) In the event OGMD is required by the provisions of Section 3(b) or 3(c) to substitute a drill site for any of the drill sites initially selected pursuant to Section 1(a), then (i) OGMD shall forwith assign and convey unto Purchaser all of its right, title and interest in and to such drill site, and (ii) Purchaser shall reassign and reconvey to OGMD the particular drill site as to which OGMD is effecting a substitution.

Section 2.

### CONSIDERATION FOR ASSIGNMENT

For and in consideration of the assignment and sale to Purchaser of OGMD's interest in the undivided interest being sold pursuant to Section 1 above, Purchaser hereby grants to OGMD a twenty-five (25%) per cent net profit reversionary interest in each of the wells drilled pursuant to this Agreement. Said net profit reversionary interest is more particularly described in Section 9 of this Agreement.

Section 3.

### DRILLING OF WELLS

(a) OGMD hereby agrees to drill and complete oil wells on the real property assigned pursuant to Section 1, at the rate of one (1) well per drill site. The manner of the drilling and completion of said wells shall be at the sole discretion of OGMD. In connection with the drilling of said wells, all necessary material and equipment shall be furnished by OGMD at a

cost of $8,060.00 per well and the drilling and completion of the wells shall be at the OGMD's own risk, cost and expense. OGMD covenants that the drilling of the first such wells shall begin within 20 days from the date of this Agreement and all wells shall be completed on or before 140 days from the date the first well is started, that such drilling shall be done in a good and workmanlike manner; that, when such drilling discovers commercial production, the wells will be fully equipped, including tankage; ... and that OGMD shall abide by all terms and conditions of the oil and gas leases affecting the drill sites and the wells....

(b) If the progress of any well covered by this Agreement is delayed by a fishing job, or jobs, or any other cause whatsoever, OGMD may at its discretion commence a new hole, all at its own cost and expense, and the drilling of the new hole shall be done under the terms of this Agreement as if it were one of the original four (4) holes, ...

(c) In the event that any of the four (4) wells are not commercially productive (as the term is hereinafter defined), OGMD shall cause to be drilled substitute wells, it being understood that OGMD's sole obligation in this regard is the completion of a total of four (4) commercially productive wells....

Section 4.

### CONSIDERATION FOR DRILLING

OGMD acknowledges that the Purchaser has, upon execution of this Agreement, paid to OGMD the sum of One Hundred Sixty-Eight Thousand ($168,000.00) Dollars which OGMD accepts as payment in full for the drilling and other services to be performed by OGMD, including the development of the real property, and for the equipment to be provided.

OGMD shall not be entitled to receive any additional payments whatsoever from the Purchaser except that the OGMD shall receive a monthly operating fee of Fifty ($50.00) Dollars per month per well for each commercially productive well drilled plus the direct costs of any necessary well "workover" operation on such wells.... Commencing with the first month of production and continuing for the next twenty-three (23) consecutive months, Purchaser shall receive one hundred percent (100%) of the net profits from oil, gas and minerals produced from said wells. Thereafter, and continuing throughout the life of this Agreement, OGMD shall have a Twenty-five percent (25%) net profit reversionary interest in each of said wells as set out in Section 9 hereof.

Section 5.

### OPERATIONS

Purchaser hereby authorizes OGMD to supervise the drilling of the wells and the development of the real property. OGMD shall manage and control the operation of all such

ty of an abstract of a money judgment which they had obtained against OGMD in a suit in the United States District Court for the Northern District of California.

Appellees contend the legal effect of the five contracts was to vest in them equitable title because each contract contemplated that OGMD would hold title to the proper-

wells for Purchaser. Subject to the rights of Purchaser set forth in Section 8, OGMD shall arrange for the marketing and sale of the production of such wells at such times and under such conditions as in its sole discretion it deems best. Without limiting the generality of the foregoing, OGMD, for the account of Purchaser, shall have exclusive charge, control and supervision of all operations of every kind to be conducted on the premises for the development, production, treatment and handling of oil, gas and other minerals therefrom, as well as the payment of rentals, royalties, taxes and other charges which may arise and become due.

Section 6.

### INDEMNIFICATION

(a) Purchaser shall not be liable or responsible for, and OGMD shall save and hold harmless Purchaser from and against any and all claims and damages of any kind, for injury to or death of any person or persons and for damage to and loss of property arising out of or attributed to, directly or indirectly, the operations of OGMD in connection with the drilling and operation of the wells provided for herein.

(b) [OGMD shall maintain in force at all times various kinds of insurance at its own cost for purchaser's benefit.]

Section 7.

### POWERS

Subject to the rights of the Purchaser set forth in Section 8, the Purchaser hereby gives OGMD the following powers:

(a) to market the oil, gas or minerals that may be produced;

(b) to collect and receive from any purchaser of such oil, gas or minerals all monies that may be due from the proceeds of the sale of such oil, gas or minerals, and to give receipts for monies received on account thereof;

(c) to pay out of the proceeds from the sale of any oil, gas or minerals produced from the wells any and all expenses reasonably incurred (including all taxes) in the production and sale of such oil, gas or minerals, and to hold and retain an aggregate sum of Fifty Dollars ($50.00) per month per commercially productive well as production operator's overhead fee.

Section 8.

### RIGHTS OF PURCHASER

The following rights, privileges and obligations of Purchaser are hereby expressly provided for and reserved to Purchaser:

(a) Purchaser, upon reasonable notice and request to OGMD shall have access to the drill sites and surrounding premises at all times to inspect and observe operations of every kind and character upon the premises; provided, that Purchaser must follow and obey any rules

reasonably established by OGMD as safety or precautionary measures;

(b) Purchaser reserves the right, at its own expense, to take in kind or to separately market its share of production from the wells in which it owns an interest under this Agreement. Purchaser shall have all necessary and reasonable access over any property of OGMD as well as the use of the well facilities, for this purpose. If Purchaser shall not elect to separately take its share of production, then such production may be sold for its account by the OGMD set forth in Section 7; . . .

(c) Purchaser shall receive all information pertaining to wells drilled, production secured and oil, gas and minerals marketed by OGMD from Purchaser's wells;

(d) OGMD shall furnish Purchaser with monthly production reports, copies of well completion records, and copies of records of stock on hand at the first of each month.

Section 9.

### PAYMENTS

(a) After deducting the proceeds of the sale of the oil, gas and minerals, the monthly operating fee of Fifty ($50.00) Dollars plus and [sic] "workover" costs as defined in Section 4, OGMD shall pay to Purchaser the balance of the proceeds from its working interest. Such payments shall be made on a monthly basis commencing on the 15th day of the first month following the initial receipt by OGMD of proceeds from the sale of oil, gas or minerals and continuing on the 15th day of each month thereafter.

(b) Commencing with the twenty-fifth (25th) month of production and continuing throughout the balance of the term of this Agreement as set out in Section 4, above, OGMD shall have a twenty-five (25%) percent interest in the net profits from the oil, gas and minerals produced from the wells. [This portion of the contract was subsequently amended to provide that the 25% interest did not become effective until the Purchaser recovered the sums paid by it under the contract.]

(c) [Net profits are defined]

Section 10.

### CLAIMS AND LAWSUITS

[Defense of any causes of action shall be under the general direction of OGMD and at its expense, including suits "involving title to any lease or oil interest subject to this Agreement." OGMD shall hold Purchaser harmless from any judgment or award resulting from any such action.]

Section 11.

### TERM OF AGREEMENT

This agreement shall remain in full force and effect for so long as the leases subject to this

ties sold to appellees, with appellees given the contract right later to demand recordation of title in their name or in another name designated by them. Section 1(b) of each instrument sets forth an agreement of that kind. From the premise that they acquired equitable title to the leasehold estates by virtue of the five contracts, appellees argue that OGMD's conveyance of the equitable title to them in 1971 was not subject to the provisions of the recordation statutes, particularly Tex.Rev.Civ.Stat.Ann. art. 6627 (Supp.1982) which declares void as to creditors and subsequent purchasers for a valuable consideration without notice any unrecorded "bargains, sales and other conveyances whatever, of any land, tenements and hereditaments." Appellees cite *Johnson v. Wood,* 138 Tex. 106, 157 S.W.2d 146, 148 (Tex.1941) (involving the issue whether plaintiff had equitable title sufficient to maintain a trespass to try title action against those purchasing immediately from him, rather than subsequent purchasers for value without notice) and *Stitzle v. Evans,* 74 Tex. 596, 12 S.W. 326, 327 (Tex.1889). The trial court agreed with appellees' contention and concluded that their equitable title, derived from their contracts with OGMD, was not subject to art. 6627.

Appellants' claim is based upon the following sequence of events: On July 19, 1976, they recorded in Caldwell County an abstract of their judgment against OGMD. On February 12, 1979, a United States Marshal executed and delivered to them a deed conveying all the right, title, and interest possessed by OGMD in the two leases—the "Callihan lease" and the "Huff lease," as well as a lease pertinent to a companion appeal, the "Travis C. Cooke, et al. lease." The Marshal's deed recites that it results from the federal court judgment obtained by appellants against OGMD, pursuant to which writ of execution was issued by the United States District Court for the Western District of Texas, levied by the Marshal on January 9, 1979 and followed by his sale of the properties to appellants on February 6, 1979 in consideration of sums credited against such judgment. Appellants claim title and the right of possession under the Marshal's deed, contending the five contracts between appellees and OGMD are void as to appellants under the terms of art. 6627. Accordingly, they contend the trial court erred in concluding that the five contracts conveyed only an equitable title effective against them and enforceable in a suit in trespass to try title.

■ The trial court's construction of the five contracts under which appellees claim is thus crucial to the appeal, for before appellees could properly prevail in their action in trespass to try title, they were required to establish their right to title and possession. *State v. Dayton Lumber Co.,* 106 Tex. 41, 155 S.W. 1178, 1179 (Tex.1913). After careful examination of the five instruments, we conclude that their legal effect was to create in appellees only a royalty or other non-possessory interest in the mineral estate, and not a right to possession

Agreement remain in force as to any part of the subject real property or until such time as all wells drilled pursuant to Section 4 hereto have been shut down and plugged, whichever of such periods expires the later. In that regard, OGMD may, at its own direction, shut down and plug any well at such time as such well becomes incapable of producing an average of eight (8) barrels of oil per day.

\* \* \* \* \* \*

Section 15.

REVERSIONARY INTEREST

As provided for in Section 2 and Section 4 of this Agreement, twenty-five (25%) percent reversionary interest in four (4) wells shall automatically revert to OGMD without further notice. The transfer of this reversionary interest back to the OGMD is a basic part of this Agreement and is not dependent upon any action of the Purchaser or the OGMD or upon any set of unnamed circumstances.

Section 16.

PREFERENTIAL RIGHT TO PURCHASE AFTER THREE YEARS

After the expiration of three (3) years from the completion of the last of four (4) wells, should Purchaser desire to sell all or part of its interests under this Agreement, Purchaser shall promptly give written notice of OGMD, ... OGMD shall then have an optional prior right, for a period of thirty (30) days after receipt of the notice, to purchase said interest of the selling purchaser at the same price and on the same terms and conditions offered by the prospective purchaser.

of that estate, with the consequence that the instruments were insufficient to support an action in trespass to try title directed at the two leaseholds themselves. *Law v. Stanolind Oil & Gas Co.,* 209 S.W.2d 381, 384–85 (Tex.Civ.App.1948, writ ref. n.r.e.) (plaintiffs may not maintain an action in trespass to try title when they have no present right of possession but only a reversionary right); *Shell Petroleum Corporation v. State,* 86 S.W.2d 245, 249 (Tex.Civ.App. 1935, no writ) (a non-possessory royalty interest is insufficient to maintain an action in trespass to try title).

The form of each of the five instruments is set forth in footnote one. Affixed to each instrument is an Exhibit A. Four of these exhibits are identical and refer to an oil, gas, and mineral lease dated March 17, 1938 from M.W. Callihan and wife, lessors, to W.W. Lincoln, lessee, recorded in Volume 171, page 82 of the Deed Records of Caldwell County, Texas, followed by a description by metes and bounds of the tracts which form the subject of the leases in which undivided percentage interests are conveyed. We shall refer to these hereafter as the "Callihan lease." Affixed to the fifth instrument is an Exhibit A which contains only the following description of the real property to which the instrument applies:

Well sites 1A through 4A, located on the Charles Huff lease, more particularly described as 123.5 acres, more or less, on the Samuel Shipp ¼ League in Caldwell, Texas.

We shall refer to this hereafter as the "Huff lease." No issue is raised on appeal as to the sufficiency of the property descriptions contained in the instruments we are required to construe. None of the instruments were recorded, although subsequent instruments were executed by OGMD and recorded. These subsequent instruments recite that OGMD, in consideration of nominal and other consideration to be recited in the instruments,

has granted, conveyed and assigned, and by these presents does hereby grant, convey and assign unto Robert R. Kressin

[general partner of appellees] all of the right, title and interest of Oil, Gas and Minerals Development Corporation in and to the following:

[The Huff and Callihan leases are described in the two respective instruments]

Grantor warrants and represents that its net revenue interest in production from the leasehold estates above described is at least 78.125%.

\* \* \* \* \* \*

And for the same consideration, the said Oil, Gas and Minerals Development Corporation, its successors and assigns, do covenant with the said [appellees are named], their heirs, successors, or assigns, that Oil, Gas and Minerals Development Corporation is the lawful owner of the said lease and rights and interests thereunder and of the personal property thereon or used in connection therewith; that the said Oil, Gas and Minerals Development Corporation has good right and authority to sell and convey the same, and that all rentals and royalties due and payable thereunder have been duly paid.

These instruments were executed, acknowledged, and recorded in 1977, that is, after appellants recorded their abstracts of judgment.

■ We believe the trial court erred in the construction it gave the five unrecorded contracts between appellees and OGMD. These five instruments do, indeed, contain language which is similar to that used in an assignment of an oil and gas lease. For example, they recite that OGMD owns the oil and gas leases described in Exhibits A attached to each of the instruments, and that OGMD is willing to sell and assign its right, title, and interest therein to the purchaser on the terms and conditions set forth. Nevertheless, when we examine the unambiguous terms of the contracts, in their entirety, we find the instruments omit to convey or assign to appellees anything except a specified number of "drill sites to be selected by OGMD at its sole discretion from locations on the real property described in Exhibit A." While purporting to be

*present* assignments and conveyances, the five instruments transfer *only* "drill sites," and those not yet selected by OGMD.[2] The five instruments do not purport to transfer the oil and gas leases referred to in the instruments; they do not purport to convey any oil or gas in place; and they do not purport to convey any control or dominion whatever over any oil and gas *before production.* They do, however, purport to create certain contract rights in appellees, the "purchasers" therein: the right (a) to be notified of the drill sites ultimately selected by OGMD; (b) to demand recordation of title in their own names respecting the thing sold to them under the agreements, or in the name of others designated by them; (c) to have the wells drilled in a specified period of time, in a good and workmanlike manner and with proper equipment; (d) to have OGMD abide by all terms and conditions of "the oil and gas leases affecting the drill sites and the wells"; (e) to have drilled certain substitute wells; (f) to receive 100% of the net profits from production from the wells until they have recovered the sums paid by them under the contracts, after which OGMD shall receive 25% of the net profits and they the remaining 75%; (g) to have OGMD manage and control operation of the wells; (h) to have OGMD market and sell production from the wells subject to appellees' right to take their share of production in kind and make their own marketing arrangements; (i) to have access to the "drill sites and surrounding premises at all times to inspect and observe operations," after reasonable notice and request to OGMD; (j) to receive periodic accountings for production and sales by OGMD; and (k) to have certain other rights not necessary to be discussed. What then is the nature of the interest created and transferred by the five contracts?

We find that an "overriding royalty" is an interest in oil and gas produced at the surface, free of the expense of production, and carved from the working interest held under an oil and gas lease, rather than from the royalty reserved by a landowner on the severance of the mineral estate. Williams and Meyers, Manual of Oil & Gas Terms, 173–74 (1957). While an overriding royalty, like any royalty, is an interest in land, "it is clearly non-possessory, and hence the owner is not entitled to possessory remedies, *e.g.,* trespass to try title in Texas . . . ." 2 Williams and Meyers, Oil and Gas Law § 418.1 at 342 (1981).

A similar interest which may be applicable to the case has been termed a "net profits interest," explained as being a fractional interest "in oil and gas property, usually the working interest, the holders of which have no personal obligation for operating costs, which are to be paid by the owner or owners of the remaining fractional interests." *Id.,* § 424 at 437. More particularly,

A net profits interest is a share of gross production from a property measured by net profits from the operation of the property. Usually it is a share of the working interest, created by grant (a carved out interest) or reservation (a reserved interest), and, under at least some circumstances, it is an economic interest in oil and gas for purposes of the federal income tax law. Under this arrangement the operator pays all costs of exploration and development and, after satisfying such costs from the proceeds of production, shares the profits on an agreed basis with the owner of the net profits interest.

*Id.,* § 424.1 at 439. A net profits interest has been held to be only a mere contract interest, and not an interest in land. *LeBus v. LeBus,* 269 S.W.2d 506, 511 (Tex.Civ.App.

---

**2.** As mentioned above, the four instruments pertaining to the Callihan lease, said by appellees to be "assignments" of the Callihan lease, have attached to them an Exhibit A which is identical in all four instances. Therefore, if one presumes that each of the four instruments constitutes an assignment of the Callihan lease, one must necessarily conclude that on separate

occasions OGMD sold and transferred the identical property to four different purchasers. The instruments themselves preclude this conclusion, however, for they each carefully delineate the thing transferred as being only "drill sites" to be assigned or fixed upon the Callihan lease by OGMD in its discretion.

1954, writ ref'd n.r.e.). Williams and Meyers suggest, however, that a better view requires that "a net profits interest should be treated in much the same manner as an overriding royalty and that it should be classified as an interest in land." *Id.* at 440. The same authors state:

A variant of the net profits interest is the so-called "Drill-site arrangement." Under this arrangement, a lessee assigns all of his interest in a given drill site, retaining a net profits or other interest therein which may or may not be convertible at some future date into a share of the working interest. In addition the assignor transfers a fraction of his interest in the balance of the leasehold.

*Id.* at 446. Whether the interest created by the five contracts is an overriding royalty or a net profits interest is not a matter we are required to decide. It is sufficient to observe that OGMD did not, by those instruments, transfer to appellees anything more than a right to production free of cost, save for a $50.00 per well operating fee and certain other matters. Whether appellees' interest be an overriding royalty or a net profits interest, it is plain that the instruments creating the interest do not purport to transfer to appellees the underlying leases or any oil and gas in place, or a fractional part thereof. We conclude, however, that the interest conveyed to appellees by the five contracts is nevertheless an interest in land. *Tennant v. Dunn,* 130 Tex. 285, 110 S.W.2d 53, 56–57 (Tex.1937) (overriding royalty held to be an interest in land). The five instruments are, therefore, subject to the statutes applicable to the recordation of instruments affecting title to land, including art. 6627. While the five instruments did transfer to appellees an interest in land, we conclude the transfer did not include the right of possession necessary to sustain an action in trespass to try title. *Law v. Stanolind Oil & Gas Co., supra; Shell Petroleum Corporation v. State, supra.* Therefore, we hold the trial court erred in awarding appellees title and possession of the leaseholds under the Callihan and Huff leases.

■ The result of the construction we have given the five contracts under which

appellees claim is that OGMD possessed, at the time appellants recorded an abstract of their judgment, legal and equitable title to the Huff and Callihan leases, subject to appellees' interest under the five contracts. However, because appellees failed to record their interests before appellants recorded their abstract of judgment, appellees' interest is void as against appellants unless appellants had actual notice thereof when the abstract was recorded, a matter to which we now turn.

The trial court found appellants had actual notice of appellees' "ownership interest" in the Callihan and Huff leases when the former recorded the abstract of judgment. The trial court's findings of fact establish that such actual notice was derived from three sources shown in the evidence: (a) face-to-face discussions between Mr. Kressin, general partner of the limited partnerships which are appellees, and representatives of appellants, the general purpose of such discussions being an exchange of information about the parties' respective "investments" in Caldwell County, Texas; (b) numerous telephone conversations between representatives of appellants and appellees; and (c) "information presented by LueRae Kramer and the OGMD staff to Jeff Mansuy representing" appellants, which information was delivered to Mr. Mansuy "in the discovery proceedings on or about March 16, 1976." These discovery proceedings followed the judgment obtained by appellants in the United States District Court for the Northern District of California.

■ We have examined the statement of facts pertaining to the first two evidentiary sources referred to above. We find the evidence devoid of any specificity whatever and one may not reasonably conclude that appellants had actual notice of appellees' "ownership interest" as a result of such discussions and telephone conversations. We believe, however, that the same may not be said of the third matter mentioned above, which refers to a deposition taken by Mr. Jeff Mansuy, appellants' attorney, in aid of the judgment obtained in the United

States District Court for the Northern District of California.

In the course of Mr. Mansuy's taking the deposition, Mrs. Kramer, an accountant for OGMD, delivered to him a ledger book containing a "subsidiary ledger," which, in turn, included three pages introduced in evidence in the present cause after being marked Exhibits 42, 43, and 44. The first two exhibits pertain to the Callihan and Huff leases, respectively; Exhibit 44 pertains to the Travis C. Cooke lease which is the subject of a separate appeal and not necessary to be discussed. Mr. Mansuy testified that he did not examine in detail the book from which the three pages were taken and did not take from the deposition any copies of those pages. In contrast, Mrs. Kramer testified that Mr. Mansuy "reviewed" the three ledger sheets at a date not "sooner than February of '76," and at the time he did so they were in the same form as they were then, except for the addition of further information made afterwards. We must therefore conclude the trial court could find from sufficient evidence that Mr. Mansuy actually read the three pages.

When one examines the two pages applicable to the present case, one finds listed in several columns what appear to be monthly amounts for, respectively, "production, gross revenue, taxes, net revenue, well maintenance, miscellaneous (charges), net income, and cash distributions." The first page, Exhibit 44 has a heading which reads:

TK 15–11  W. M. Callihan   .78125   Kressin .9318182%
                                     Herron  .0681818%

The second page, Exhibit 45, has a heading which reads:

TK 15–4  Chas. Huff  .8203125   Dr. Herron     12.5%
                                Kressin note   12.5%
                                  "      "      75 %
                                .25% RI @ Payout

There is in the record additional testimony that the symbol "TK" represented in the accounting practices of OGMD a reference to the word "turnkey," a shorthand characterization of the rights and obligations of the kind set forth in the five contracts between OGMD and appellees; and, other evidence to the effect that in OGMD's accounting practices, the same symbol was used in reference to appellants' own contracts with OGMD, for the breach of which they recovered judgment against OGMD. From such evidence, appellees contend appellants were charged with a duty to inquire further, and by use of the means reasonably at hand, appellants would have discovered appellees' outstanding but unrecorded "ownership interest," as the trial court found.

Mr. Mansuy admitted that his purpose in examining the records of OGMD in the course of the deposition was to discover assets owned by OGMD from which appellants might obtain satisfaction of their judgment. In three reported decisions, a trial court's finding of actual notice was sustained when it rested upon evidence that an agent or employee of the party charged with such notice had actually discovered information which was in itself, fragmentary, incomplete, ambiguous or uncertain, but nevertheless sufficient to invoke a duty of further inquiry in a reasonable and prudent person, owing to the nature of the information actually perceived in the context of a search aimed at ascertaining the ownership of property.

In *Woodward v. Ortiz,* 150 Tex. 75, 237 S.W.2d 286, 290 (Tex.1951), the finding of actual notice rested upon evidence showing that an agent of the party charged with such notice had noted on an index card, in his own hand, a reference to a subsisting judgment against a person claiming to own real property. The notation was made in the course of the agent's title investigation, which encompassed his obtaining information about any such subsisting judgments. The trial court's finding of actual notice was sustained, the duty of further inquiry having arisen. In *Hexter v. Pratt,* 10 S.W.2d 692, 693 (Tex.Comm.App.1928, jdgmt adopted), an attorney employed by a mortgage lender to examine an abstract of title "was advised of the contents of the abstract, including" a specific claim to title made in a lawsuit which had been dismissed for want of prosecution, a memorandum of which was included in the abstract. The

attorney noted the abstract entry, but chose not to report it as a title defect, reasoning that the court's order of dismissal had foreclosed any claim of title made in the suit. The finding of actual notice was sustained on the theory that the examining attorney, having been apprised of the claim made in the lawsuit, was under a duty to inquire further to discover the extent and right of the plaintiff's claim. In *Flack v. First National Bank of Dalhart,* 148 Tex. 495, 226 S.W.2d 628, 630–31 (Tex.1950), a lending bank's employee inspected cattle offered by a loan applicant as security for the loan. The employee discovered upon inspection that the cattle were not branded with the loan applicant's brand, contrary to his representation; and was told by a person in apparent charge of the cattle that they were not "entirely" owned by the loan applicant, an ambiguity which was contrary to the truth (the loan applicant owned no interest in the cattle whatever), but also contrary to the loan applicant's representation to the bank. The bank employee testified that the absence of a brand in the circumstances "would make one wonder" about the truth of the applicant's claim of ownership. Other evidence established that verification of the true ownership of the cattle could have been obtained easily from another bank which held a lien on the cattle, to which bank the applicant had in fact directed the first bank from which he sought a loan. Upon such evidence, the Supreme Court of Texas sustained the trial court's finding of actual notice.

The issue is not whether we believe Mr. Mansuy actually read the two pages marked Exhibits 44 and 45, or whether we are of opinion that the information contained therein was under the circumstances sufficient to give rise to the duty of further inquiry. Rather, the question is whether it was unreasonable of the trial judge to infer and conclude from the facts and circumstances in evidence that Mr. Mansuy discovered the information contained in the two sheets and whether that information, in the circumstances wherein it was discovered, was of a nature calculated to excite further inquiry in a reasonable and prudent person,

which if reasonably pursued would have led to actual discovery of appellees' outstanding but unrecorded "ownership interest." If the trial court's inference and conclusion are not unreasonable under the evidence, we must overrule appellants' no evidence and insufficient evidence points and hold there was sufficient evidence to support that court's finding of fact. *Woodward v. Ortiz, supra,* 237 S.W.2d at 290.

The nature of the headings on Exhibits 44 and 45 is consistent, perhaps, with a debtor-creditor relationship between OGMD, on the one hand, and Kressin and Herron on the other, and when more than one reasonable inference may be drawn, it has been said that the duty of further inquiry does not arise. *Houston Oil Company of Texas v. Griggs,* 181 S.W. 833, 838 (Tex. Civ.App.1915), aff'd, 213 S.W. 261 (Tex. Comm.App.1919, holding approved). Moreover, we observe that the two pages do not expressly refer to any of the limited partnerships (appellees) by name, although Mr. Kressin, the general partner, is evidently referred to by his surname. Nevertheless, the headings on the respective pages do contain the designations "W.M. Callihan" and "Chas. Huff," followed by a percentage figure consistent with an ownership interest, or at least an entitlement to an oil payment, and Exhibit 45 contains the words ".25% RI @ Payout" which are consistent with a transfer of an ownership interest of some kind. Mrs. Kramer testified that Mr. Mansuy actually reviewed the two pages; the coincidence in the lease names is strong; there is evidence that appellants' knew Mr. Kressin was the general partner of the limited partnerships (appellees); the purpose of the deposition and production of the documents belonging to OGMD was to discover assets from which to obtain satisfaction of appellants' judgment; and the symbol "TK" was shown to be that used to designate on the books of OGMD appellants' own ownership interest under similar contractual arrangements. While we may have found differently, as an original matter, on the issue of whether appellees discharged their burden of showing actual notice, we

may not say that the trial court's finding in that regard is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *Miller v. Riata Cadillac Co.,* 517 S.W.2d 773, 777 (Tex.1974); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (Tex.1951). Accordingly, we sustain the trial court's finding of actual notice.

The remaining points on appeal are necessarily determined by our decisions on the matters discussed above. We shall, nevertheless, discuss them briefly.

■ Appellants contend the trial court erred in finding they had constructive notice of appellees' outstanding unrecorded instruments under the five contracts, owing to the recordation of those instruments in the "contract" records maintained by the county clerk. The point is rendered moot by our decision relative to actual notice.

■ Appellants contend the trial court erred in awarding appellees' full title to the leaseholds, thereby voiding the 25% "reversionary interest" in the net profits from the wells drilled on the leases, an interest reserved by OGMD under the five contracts. This point is rendered moot by our decision that the contracts between OGMD and appellees conveyed to the latter only a non-possessory interest in production from the two leasehold estates, subject to the terms and conditions of the five contracts of which appellants had actual notice. One provision of the five contracts is, of course, the right of OGMD and its successors in title and possession to receive 25% of the net profits realized from production, after appellees recover the sums paid by them under each such contract.

In appellants' last point of error, they contend the trial court erred in awarding appellees $65,075.53 in money damages, which sum is derived from $90,133.00 in money damages assessed against appellants for "wrongful execution and tortious interference," less the sum of $25,057.47, which was the cost of operating the wells while appellants were in possession, according to findings of fact made by the trial court.

The "wrongful execution" found by the trial court refers, of course, to the action of appellants in causing the Marshal to levy the writ of execution issued by the United States District Court for the Western District of Texas. The "tortious interference" found by the trial court refers to appellants' action in notifying the gathering company (which purchased production from the wells) of appellants' claim under their judgment lien. In the trial court's conclusions of law, no distinction is made between the two torts of "wrongful execution and tortious interference," and the sum of $65,-075.53 presumably rests upon both theories of action.

■ Insofar as the sum awarded rests upon the tort of "wrongful execution," we must disagree with the trial court's conclusion of law because it depends entirely upon the erroneous theory that appellees, as a result of their five bilateral contracts with OGMD, acquired equitable title to the working or operating interest under the Callihan and Huff leases, as opposed to a mere non-possessory interest in a portion of the minerals produced from the wells drilled on the two leases. Having held that appellees acquired only the latter kind of interest in land, as a result of the five contracts with OGMD, we must conclude that OGMD did not part with title to the working interest under the Huff and Callihan leases as a result of the five contracts; and the right, title and interest of OGMD in the fee simple determinable, created by the Callihan and Huff leases, was therefore a subsisting estate subject to the Marshal's levy. His levy was therefore not wrongful. We must also conclude the trial court was in error in its conclusion of law that appellants had tortiously interferred with appellees' asserted contract with the gathering company, for this theory depends also upon the premise that appellees succeeded to the contract rights of OGMD as owner of the working or operating interest under the Callihan and Huff leases, a position now occupied by appellants under our construction of the five instruments by which appellees claim.

Accordingly, we reverse that part of the judgment awarding appellees $65,075.53 for wrongful execution and tortious interference, and here render judgment that appellees take nothing by their claims in that regard. That portion of the judgment awarding appellees their costs of court is reversed and judgment is here rendered assessing costs of suit against appellees and appellants in equal shares, including the sums awarded the attorney *ad litem.*

That part of the trial court judgment awarding appellees title to, and possession of, the Callihan and Huff leases is reversed, and that portion of the cause is remanded to the trial court with instructions that it enter judgment awarding title and possession thereof to appellants, subject to appellees' interest in production from the wells drilled on the two leases, payable on and under the terms and conditions set forth in the five contracts between appellees and OGMD.[3]

---

**3.** We note, in the context of these causes, that the provisions of Tex.R.Civ.P.Ann. 434 (Supp. 1982) normally require that, upon reversal, we render the judgment the trial court should have rendered. We are hampered, however, as stated *infra,* by some uncertainty as to a sufficient description of the subject leases, particularly with reference to the Huff lease. We therefore deem it advisable to remand this portion of the cause for entry of judgment by the court below.