In re NETTEL CORPORATION, INC.,
NETtel Communications, Inc.,
Debtors.

Wendell Webster, Trustee, Plaintiff,

v.

Scott & Reid General Contractors,
Inc., Defendant.

Bankruptcy No. 00–01771.
Adversary No. 02–10118.

United States Bankruptcy Court,
District of Columbia.

Sept. 21, 2011.

Linda M. Correia, Webster, Fredrickson, Correia & Puth, P.L.L.C., Washington, DC, for Plaintiff.

Wendell W. Webster, Webster, Fredrickson, Correia & Puth, Washington, DC, pro se.

Philip T. Evans, Holland & Knight, Washington, DC, for Defendant.

## MEMORANDUM DECISION AND ORDER ADDRESSING RENEWED MOTIONS FOR SUMMARY JUDGMENT

S. MARTIN TEEL, JR., Bankruptcy Judge.

In a previous order dealing with cross-motions for summary judgment, I granted the trustee's motion for summary judgment on his preference action as to all issues except as to Scott & Reid's 11 U.S.C. § 547(c)(1) defense that the payment it received pre-petition was a contemporaneous exchange for new value. *Webster v. Scott & Reid Gen. Contractors, Inc. (In re NETel Corp., Inc.)*, 2008 WL 5071733 (Bankr.D.D.C. Oct. 10, 2008). That remaining issue is addressed here.

### I

Invoking 11 U.S.C. §§ 547(b) and 550(a), the complaint in this proceeding against Scott & Reid General Contractors, Inc. ("Scott & Reid") seeks to recover a pre-petition payment of $129,508.36 made by the debtor, NETtel Corporation, Inc. ("NETtel"), to Scott & Reid.[1] The plaintiff,

---

1. There are two debtors in these jointly administered chapter 7 cases: NETtel Corporation, Inc. and NETtel Communications, Inc. The pertinent debtor here is NETtel Corporation, Inc. and the use of "NETtel" will refer only to it.

Wendell W. Webster, is the trustee of NETtel's estate under Chapter 7 of the Bankruptcy Code.

The payment, made within the ninety days preceding NETtel's bankruptcy filing, was for construction work Scott & Reid had performed on real property located on Addison Road in Addison, Texas in which NETtel held a leasehold interest. Article XVI, § 37 of the Texas Constitution provided Scott & Reid with an automatic lien on that leasehold interest for the value of Scott & Reid's labor and materials. Scott & Reid contends that the payment it received on August 31, 2000, effected a release of its constitutional lien, citing *Wood v. Barnes*, 420 S.W.2d 425 (Tex.Civ.App.1967), and thus the payment was made in exchange for its release of the constitutional lien. Accordingly, it argues, the payment cannot be avoided as it constitutes a contemporaneous exchange for new value under § 547(c)(1). For reasons that follow, the trustee has shown that Scott & Reid cannot carry its burden of proof under 11 U.S.C. § 547(g) to show that § 547(c)(1) applies, and summary judgment in his favor is thus appropriate.

## II

Summary judgment is appropriate if, assuming all reasonable inferences favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court will not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 342 (D.C.Cir.2003). Although a finder of fact at trial is permitted to draw inferences from the evidence, those inferences "must be reasonably probable, and based on more than speculation." *Rogers Corp. v. EPA*, 275 F.3d 1096, 1103 (D.C.Cir.2002) (internal quotations and citations omitted). When the evidence allows for contradictory inferences, summary judgment is inappropriate. *Id.* (citing *Londrigan v. FBI*, 670 F.2d 1164, 1171 n. 37 (D.C.Cir.1981)).

The moving party bears the burden to show that the material facts are undisputed. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The nonmoving party, however, may not rest on mere allegations or denials, but must instead demonstrate the existence of specific facts that create a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505.

## III

Section 547(c)(1) sets forth a "contemporaneous exchange for new value" exception to a trustee's avoidance power under § 547(b) and provides that:

> The trustee may not avoid under this section a transfer—
>
> (1) to the extent such transfer was—
>
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>
> (B) in fact a substantially contemporaneous exchange.

Thus, to prevail on a contemporaneous exchange for new value defense, Scott & Reid must satisfy a three-part test, showing (1) that it extended new value to the debtor; (2) that both parties *intended* the alleged new value and reciprocal transfer by the debtor to be contemporaneous; and (3) the exchange was in fact contemporaneous. 5 Collier on Bankruptcy ¶ 547.04[1] (15th ed. as revised April 2010).

■ Two primary issues arise: first, whether the release of the constitutional lien was not "new value" because the lien was void or voidable by the trustee under applicable law, and, second, whether the payment was intended by both parties as an exchange for "new value." I conclude that the trustee is entitled to an award of summary judgment in his favor as to each of these issues.[2]

## IV

To invoke § 547(c)(1), Scott & Reid must first demonstrate that release of the leased premises from the constitutional lien qualified as "new value." Section 547(a)(2), as applicable here, defines "new value" as including "money's worth in ... release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by ... the trustee under any applicable law...."

### A

The trustee has the power to avoid any transfer of property of the debtor that is voidable by a hypothetical bona fide purchaser who obtains the status of bona fide purchaser at the time of the commencement of the case. 11 U.S.C. § 544(a)(3). It is thus necessary to turn to Texas law to determine whether Scott & Reid's constitutional lien would have been defeated by a bona fide purchaser.

■ Under Texas Property Code § 53.052(a), the holder of a constitutional lien must file a lien affidavit by the fifteenth day of the fourth calendar month after the day on which the debt accrues to make the constitutional lien enforceable, via constructive notice, against a subsequent bona fide purchaser without actual notice. *Texas Wood Mill Cabinets, Inc. v. Butter,* 117 S.W.3d 98, 105 (Tex.App.2003). Constructive notice is imputed during the approximately four-month period under Texas Property Code § 53.052(a) during which a contractor can file an affidavit to record his lien. *Id.* at 105–06; *Keating Implement & Mach. Co. v. Marshall Elec. Light & Power Co.,* 74 Tex. 605, 12 S.W. 489 (1889). "When a lien affidavit is filed after the property is sold by the owner who contracted for the improvements, the purchaser is deemed to have constructive notice of a contractor's right to assert a lien for the statutory period, even where the filing period commenced prior to the purchase." *Butter,* 117 S.W.3d at 105, citing *Valdez v. Diamond Shamrock Ref. & Mktg. Co.,* 842 S.W.2d 273, 276 (Tex.1992). Constructive notice of the constitutional lien via the recordation statute continues after the statutory recordation period has expired only if the contractor timely filed such an affidavit. Two issues thus arise: when did the statutory period expire, and if it expired prior to August 31, 2000, would a subsequent bona fide purchaser have been on inquiry notice such as to be deemed to be on actual notice.

### B

■ The evidence reasonably supports a finding only in the trustee's favor that the work on the project was completed in April 2000, such that the period under Texas Property Code § 53.052(a) for filing a lien affidavit expired on August 15, 2000. Accordingly, the lien would have been avoid-

---

**2.** Section 547(c)(1) would only protect Scott & Reid to the extent of the money's worth of the new value it allegedly conferred upon NETtel. *See Sulmeyer v. Pac. Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 733 (9th Cir.1994); *Creditors' Comm. v. Spada (In re Spada),* 903 F.2d 971, 976–77 (3d Cir.1990) (holding that party seeking shelter of § 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange). That issue is not before the court.

able by a hypothetical bona fide purchaser of NETtel's leasehold interest, without notice, as of when NETtel made the payment to Scott & Reid on August 31, 2000, and as of the commencement of the bankruptcy case on September 28, 2000.[3]

Sometime prior to March 27, 2000, Scott & Reid submitted a bid to perform construction work on NETtel's Addison Road property. On March 27, 2000, Jimmy Ellis of NETtel sent a letter to Scott & Reid informing it that a purchase order was being approved within NETtel, and would be forwarded to Scott & Reid upon approval, and asking that Scott & Reid "recognize this as our 'letter of intent' to proceed with securing the building permit and start construction in order to keep the project on schedule for a complete date of April 15, 2000." NETtel later issued a purchase order to Scott & Reid dated April 3, 2000, for the purchase of Scott & Reid's construction services (the "Purchase Order"). The Purchase Order provided that Scott & Reid would construct certain improvements at NETtel's leased premises on Addison Road, in return for which NETtel agreed to pay Scott & Reid all amounts due once the work was complete and 30 days after invoice.

Scott & Reid performed the work called for under the purchase order (the "NETtel Project"), and the work was accepted by NETtel. A "final clean" was performed on April 20, 2000.

Scott & Reid argues that some remaining work could have been undertaken during the early days of May 2000, before or slightly after the invoice was submitted to NETtel on May 3, 2000. If that were the case, the filing period would not have expired until September 15, 2000, which would mean that as of the time NETtel rendered payment, even a bona fide purchaser without actual notice would have been subject to the constitutional lien. In support of its contention, Scott & Reid cites to the deposition of Nick Goettsch. Mr. Goettsch testified that, although the final cleaning performed on the job was completed on April 20, 2000, sometimes problems are discovered after that period—such as an electrical outlet that does not work or a drawer that does not slide correctly—and it is thus possible that this type of work occurred after the April 20th final cleanup. Mr. Goettsch reported that "a lot of times" such things are repaired after final clean-up, and based on that "[t]here's a good chance we could have done some work in May as well."

Despite Mr. Goettsch's statement that such work might have occurred, Scott & Reid has produced no evidence that such work actually did occur in early May 2000. Mr. Goettsch did not testify that he had knowledge, if not records, that any May

**3.** Scott & Reid asserts that whether the thing exchanged is "new value" is determined for purposes of an 11 U.S.C. § 547(c)(1) defense in reference to the date of the exchange, not the date of the bankruptcy filing. (Dkt. No. 79, p. 9) (citing *Cocolat, Inc. v. Fisher Dev., Inc. (In re Cocolat, Inc.)*, 176 B.R. 540, 547 (Bankr.N.D.Cal.1995)). Whether the constitutional lien constitutes "new value" here depends upon whether a bona fide purchaser of the leasehold interest could avoid the lien. *See* 11 U.S.C. §§ 544(a)(3) and 547(a)(2). Pursuant to § 544(a)(3), whether the bona fide purchaser could avoid the lien is calculat-

ed "at the time of the commencement of the case." Scott & Reid does not address if a hypothetical bona fide purchaser's ability to avoid the constitutional lien need also be calculated at the time of the payment, rather than the filing date. However, the distinction is not dispositive here. Payment was made on August 31, 2000, sixteen days after the expiration of Scott & Reid's statutory period to record the constitutional lien against future purchasers. Regardless of whether August 31st or September 28th, the date of filing, is used, the analysis is materially unchanged.

work occurred, and presumably any evidence that existed demonstrating that May work occurred would be in the possession of Scott & Reid, the company that was responsible for that work. Yet, Scott & Reid has put forth no evidence to support that work *actually* did occur in May. The only evidence presented here is that the final clean-up was finished on or before April 20th; based upon that evidence, work was completed in April 2000.

## C

■■■■ The next issue is whether, after Scott & Reid failed timely to file a lien certificate, a hypothetical bona fide purchaser would have been on inquiry notice and thus had constructive notice of Scott & Reid's constitutional lien. The trustee's actual notice is irrelevant under § 544, and there having been no constructive notice (because Scott & Reid failed timely to file a lien affidavit prior to August 31, 2000), the issue is whether, under Texas law, a hypothetical purchaser would be on inquiry notice and thus charged with implied knowledge of Scott & Reid's lien. *Realty Portfolio, Inc. v. Hamilton (In re Hamilton)*, 125 F.3d 292, 298 (5th Cir.1997). As observed in *Hamilton*, 125 F.3d at 299–300, quoting *Woodward v. Ortiz*, 150 Tex. 75, 237 S.W.2d 286, 289 (1951):

> Under Texas law ... inquiry notice is a form of implied knowledge; it is not actual, personal knowledge of the type made irrelevant under section 544(a). A hypothetical purchaser on inquiry notice is chargeable with implied knowledge of facts that would be discovered by a rea-

sonably diligent inquiry.... The duty of inquiry is governed by standards of reasonableness, extending to "those things which a reasonably diligent inquiry and exercise of the means of information at hand would have discovered."

[Citations omitted.]

■■■■ Nevertheless, under Texas law, inquiry notice only arises when there is some fact putting the purchaser to the duty to make further inquiry:

> The duty of inquiry extends only to matters that known facts fairly suggest. *Flack v. First Nat. Bank*, 148 Tex. 495, 226 S.W.2d 628, 631 (1950).... The law charges one who has knowledge of facts that would cause a prudent man to inquire further with notice of the facts that, by use of ordinary intelligence, he would have learned. *Flack*, 226 S.W.2d at 632.

*Welborn Mortg. Corp. v. Knowles*, 851 S.W.2d 328, 331 (Tex.App.1993). *See Texoma Adver. Co. v. Siblings, L.L.C.*, No. 14–08–00602–CV, 2009 WL 1660619, at *5 (Tex.App. June 16, 2009) (mem. op.) (distinguishing *Butler*, 117 S.W.3d at 105, on the basis that in *Butler* "there were facts that put the purchaser on notice that further inquiry was necessary"). Moreover, inquiry notice applies only when there is a duty to inquire. *Flack*, 226 S.W.2d at 632. In other words, inquiry notice would apply here to a hypothetical purchaser only if circumstances really known to the purchaser would have alerted an honest and prudent person of the need further to investigate the rights of Scott & Reid. *Id.*[4]

---

4. *See also Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex.1983) (inquiry notice applies, to uncover fraudulent concealment of cause of action, "when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery"); *Boswell v. Farm & Home Sav. Ass'n*, 894

S.W.2d 761, 766 (Tex.App.1994) (issue was whether "documents placed Farm and Home on inquiry notice," citing *Westland Oil Dev. Corp.*, 637 S.W.2d 903, 908 (1982)); *Noble Mortg. & Invs., LLC v. D & M Vision Invs., LLC*, No. 01–09–00987–CV, 2011 WL 940756, at *16 (Tex.App. Mar. 17, 2011) (bona fide purchaser entitled to that status unless there

In other words, there is no duty to chase down every speculative or conjectural possibility of an unrecorded lien. *See Hamilton*, 125 F.3d at 302, citing *Teofan v. Cools (In re Spring Creek Invs.)*, 71 B.R. 157, 160 (Bankr.N.D.Tex.1987) ("the duty does not extend to exhaustive inquiry or investigation of speculation and conjecture").

Construction concluded at the end of April 2000. Upon ascertaining from NETtel that Scott & Reid's work had been completed in April 2000, and that no lien affidavit had been timely recorded, a purchaser would have had no reason to inquire further unless some fact came to its attention triggering a duty to inquire whether Scott & Reid remained unpaid.

Typical cases addressing a duty to inquire into possible title defects include cases like *Hamilton*, 125 F.3d at 301, where the property being acquired had been foreclosed upon, and although no trustee's foreclosure deed had been recorded, the property remained subject to an unreleased deed of trust, putting a later purchaser on notice of the need to inquire into the status of that lien. Or cases like *Collum v. Sanger Brothers*, 98 Tex. 162, 82 S.W. 459 (1904), where the property is occupied by someone other than the seller, triggering a duty to inquire into the nature of the occupant's claim in the property. Here, in contrast, there was no condition of the property or indication in the land records that would have alerted a purchaser of the need to inquire into unrecorded adverse interests.

If there was no fact coming to the purchaser's attention suggesting that materialmen and mechanics remained unpaid, it would have no duty to inquire in that regard. Otherwise a purchaser would always have a duty to make inquiry as to unpaid work on the premises regardless of how old the work was (be it five months to a year old or more than a year old). There was nothing here that necessarily would have brought a fact to a purchaser's attention that would impose on it a duty to inquire whether construction bills remained unpaid.

 Scott & Reid argues that a hypothetical bona fide purchaser would have had inquiry notice because reasonable diligence would have alerted the purchaser of the constitutional lien. Specifically: (1) visible, recent construction activity would have triggered a duty of further inquiry; (2) any discussion with the landlord concerning the transfer or assignability of the NETtel lease would have raised facts pointing to a constitutional lien; (3) seeking assurances from the seller in regards to a lack of encumbrances would have led to discovery of the constitutional lien; (4) title insurance companies would require an affidavit establishing that no unpaid liens existed; and (5) the obligation for the purchaser to honor NETtel's obligation to pay any liens asserted against the premises would cause it to inquire whether any liens remain unpaid. All of these arguments fail because they rely on speculative assumptions regarding what a purchaser would have done in making a purchase. That many purchasers *do* make certain inquiries in order to protect themselves against unrecorded constitutional liens does not mean that a hypothetical bona

---

is "evidence that would put a mortgagee or purchaser on inquiry notice"); *Biswell v. Gladney*, 182 S.W. 1168, 1169 (Tex.Civ.App. 1916) ("[N]or does this record charge him with any fact by which, on the doctrine of inquiry, notice of said deed could be imputed to him."); *Nguyen v. Chapa*, 305 S.W.3d 316, 324–25 (Tex.App.2009) ("One form of constructive knowledge imputes notice where a subsequent purchaser has a duty to ascertain the rights of a party in possession. The duty to ascertain arises only if the possession is visible, open, exclusive, and unequivocal.") (citation omitted).

fide purchaser under § 544(a)(3) is subject to a duty under Texas law to make such inquiries. A bona fide purchaser in our case might forego making further inquiries upon receiving assurances that all construction was completed in April 2000 and no lien affidavits were timely filed; or upon receiving a warranty from the seller that no liens exist, carrying with it an obligation to reimburse the purchaser if any enforceable unrecorded liens were later asserted; or upon acting without the advice of competent counsel regarding inquiries that a more cautious purchaser might make. Such a purchaser is under a duty to inquire about unpaid construction bills only if some fact suggests to it that there are unpaid bills (and thus an existing constitutional lien regardless of when the work was performed). To be a bona fide purchaser under Texas law does not require that the purchaser be the most cautious type of purchaser. To avoid a finding that it was on inquiry notice of a Texas constitutional lien, Texas law only requires that a purchaser act without knowledge of the lien and without having failed to make inquiries when some fact suggests to it that construction bills remain unpaid (such that a constitutional lien exists despite the lack of a timely recordation of a lien).

*The Recent Construction Argument.* The court rejects Scott & Reid's argument that "recent" construction activity at the property would have placed a hypothetical bona fide purchaser on inquiry notice. Construction concluded at the end of April 2000. For purposes of the court's § 544 analysis, a hypothetical bona fide purchaser is deemed to have purchased the property, without statutory constructive notice of the lien, anytime from the date of NETtel's payment to Scott & Reid (August 31, 2000), up until the date of the commencement of the bankruptcy case (September 28, 2000). Construction having concluded at the end of April 2000, nearly five months would have passed between the "recent" construction and the date of inspection and purchase by the hypothetical purchaser. Scott & Reid has cited no decisions holding that months-old construction puts a purchaser to a duty of inquiry. The decisions Scott & Reid relies upon involved construction that was ongoing, at least when the purchaser viewed the property shortly before the sale, if not during and immediately after the sale. *See Contract Sales Co. v. Skaggs,* 612 S.W.2d 652, 653 (Tex.Civ.App.1981) (notice where construction occurred "at or shortly before" the purchaser took possession); *Inman v. Clark,* 485 S.W.2d 372, 374 (Tex.Civ.App.1972); *Tomlinson v. Higginbotham Bros. & Co.,* 229 S.W.2d 920, 921–22 (Tex.Civ.App.1950) (lender saw that construction had not been completed and was ongoing when he inspected house prior to making loan); *Marks v. Calcasieu Lumber Co.,* 245 S.W.2d 749, 752 (Tex.Ct. App.1952) (affidavit of lien was filed during 120–day period, and purchasers had duty of inquiry in that regard); *see also Detering Co. v. Green,* 989 S.W.2d 479, 482 (Tex.App.1999) (no notice where there was no evidence that construction was on-going at the time of the sale).

The months-old construction here would not trigger a purchaser's duty to inquire. Under Texas Property Code § 53.052(a), a contractor, if unpaid, can secure its constitutional lien against a bona fide purchaser by filing an affidavit by the fifteenth day of the fourth calendar month after the work is completed. *Butter,* 117 S.W.3d at 105; *Detering Co.,* 989 S.W.2d at 481. This approximately four-month period had expired on August 15, 2000, prior to a hypothetical purchase on or after August 31, 2000 (the date of the payment to Scott & Reid). Because Scott & Reid did not file a lien affidavit, a bona fide purchaser would not have had statutory constructive notice

of that lien, and upon learning when construction was completed and seeing that no lien affidavit was timely filed, the purchaser would not have had reason to inquire.

Scott & Reid's reliance upon *Butter* and *Inman* is misplaced. Scott & Reid correctly asserts that the court in *Butter* held that construction activities need not be performed "at or after the date the purchaser takes possession" to impute notice onto a hypothetical purchaser. 117 S.W.3d at 106. However, unlike here, the purchaser in *Butter* observed the construction approximately one month prior to the closing. Accordingly, the purchaser was on inquiry notice of the lien because the contractor was still within the approximately four-month statutory period within which to assert it. *See id.* In *Inman*, the purchase was made during the statutory 120–day period for filing an affidavit of lien, and thus the purchasers were on statutory constructive notice; moreover, a few days before completing their purchase, the purchasers saw that labor and material were being furnished, and thus were on inquiry notice. *See* 485 S.W.2d at 374.[5]

Similarly, *Marks v. Calcasieu Lumber Co.*, 245 S.W.2d at 752, does not stand for the proposition Scott & Reid advances. In *Marks*, the materialman supplied and delivered materials used in the construction as late as November 20, 1947, and timely filed an affidavit of lien on March 10, 1948. This gave statutory constructive notice superior to claims of purchasers, who had only themselves to blame for not inquiring whether there were any outstanding liens. It was in that context that the court observed that the purchasers "were under the duty at the time they purchased the property, the improvements on which were but newly constructed, to determine whether or not there were any outstanding materialmen's or mechanic's liens against the property." *Id.* The *Marks* court did not address what would have happened had the materialman failed to file an affidavit within the statutory period, and the purchasers bought the property *after* the statutory period had expired, with no fact coming to their attention that construction bills remained unpaid. Such a purchaser would take free of the constitutional lien. *See McEvoy v. Ron Watkins, Inc.*, 105 B.R. 362 (N.D.Tex.1987); *Detering Co. v. Green*, 989 S.W.2d at 482.

Having cited no decisions holding that a duty of inquiry exists when the purchase is made shortly after the deadline for filing a lien affidavit has expired, Scott & Reid instead relies on the opinion of an expert, a real estate lawyer who opines that very recent construction would prompt a purchaser to make inquiry, but (as he opined on deposition) construction that is six months or older would not. As acknowledged by the expert, there is no duty to inquire regarding the existence of a constitutional lien "if there are no facts to point out to a bona fide purchaser the possible existence of a constitutional lien." Dep. (Dkt. No. 77, Ex. 9) at 19: 1–6. The recent expiration of the statutory deadline is not a fact suggesting that construction bills remain unpaid such that the purchaser ought to inquire whether the bills have been paid. Texas law does not impose a duty of inquiry, when the time for filing an affidavit for a constitutional lien has ex-

---

5. Specifically, the *Inman* purchaser moved into the townhouse while the contractor was "still furnishing labor and materials," and thus could "plainly see that labor and material were being furnished by the [contractor] within the statutory period for filing [its] lien." 485 S.W.2d at 374. "New" construction completed over four months prior would not create this "plain" insight that a constitutional lien's statutory period was still on-going.

pired, based on how recently the time for filing an affidavit expired.

The expert's opinion is an opinion as to what inquiries an attorney would advise a purchaser to make, in an abundance of caution, to protect that purchaser from the possibility that, due to an error in ascertaining the date on which the work was completed, the time for recording a constitutional lien may not have expired. Such an opinion might be relevant to the standard of care applicable to an attorney advising his client, but it does not demonstrate a duty on the part of a purchaser to make such an inquiry. If a purchaser ascertains that the time for filing a lien affidavit has expired with no affidavit being filed, that signifies to the purchaser that no unpaid bills remain, and the purchaser would have no reason and no duty to make inquiry based on the filing period having only recently expired.

*Discussions With Landlord re Assignability of Lease.* Scott & Reid argues that a purchaser, in discussing assignment of the lease with the landlord (whose consent to assignment was required), would have been informed by the landlord that Scott & Reid's bill had gone unpaid. This is pure speculation. Under paragraph 21(b)(2) of the lease, NETtel was to "remain primarily liable under this Lease and shall guaranty the Lease if Landlord so requests." Moreover, under paragraph 21(b)(6) of the lease, the net worth of the purchaser was required to be "reasonably sufficient for the obligations under this Lease." Accordingly, the landlord would not necessarily have had reason to disclose to a purchaser that NETtel had not paid Scott & Reid, and, in any event, a failure to make such a disclosure might arise through inadvertence or based on an assumption by the landlord that the purchaser would have addressed unpaid construction bills with NETtel.

*Argument That a Purchaser Would Have Learned of Scott & Reid's Lien From NETtel.* Scott & Reid speculates that a purchaser would have discovered its lien via inquiry of NETtel.[6] Speculation about something that would not necessarily have occurred does not establish any duty of inquiry. Likewise, even if we assume, for the sake of argument, that a purchaser would have inquired with NETtel, we can only speculate that NETtel would have been forthcoming. As illustrated in Texas case law, sellers sometimes falsely certify that all construction bills are fully paid. *See, e.g., Butter,* 117 S.W.3d at 106.

■ Moreover, the trustee, as a hypothetical purchaser, is not charged with actual knowledge of the debtor. *See Sandy Ridge Oil Co. v. Centerre Bank Nat'l Ass'n (In re Sandy Ridge Oil Co.),* 807 F.2d 1332 (7th Cir.1986); *In re*

---

**6.** The expert stated, in relevant part, in his Second Declaration,:

 4. Generally speaking, a prudent purchaser of an interest in real property will require that the seller demonstrate that its claim to the property interest is free and unencumbered of any liens, including any liens or claims that may not appear in the property records. This is typically done through a sworn statement of unrecorded liens and claims, commonly referred to as an Affidavit of Debts and Liens (the "Affidavit").

 5. The Affidavit is considered prudent title underwriting practice by title companies and is typical practice to require same in closing real estate transactions in the State of Texas. It is used in determining the existence of parties who have claims against the property which are not filed of record in the real property records of the county in which the subject property is located at the time of closing, particularly unpaid contractors, unpaid subcontractors and other inchoate liens on property.

[Scott & Reid's Renewed MFSJ, Exh. H (Dkt. No. 76).]

*Williams,* 124 B.R. 311, 315 (Bankr. C.D.Cal.1991) (trustee's § 544(a)(3) powers are defeated by "neither actual nor constructive notice to the trustee through the debtor"). If the rule were otherwise, there would almost never be a successful § 544(a)(3) action.

All construction having been concluded in April 2000, and no constitutional lien having timely been filed, a hypothetical purchaser could have justifiably assumed, on that basis, that all bills had been paid. Such a purchaser would have had no duty, running to Scott & Reid, to make further inquiry into whether all construction bills had been paid unless some fact came to the purchaser's attention to suggest otherwise. Scott & Reid has pointed to no such fact. This is not, for example, a case in which a purchaser discovers an untimely lien affidavit, thereby triggering a duty of inquiry. Rather, it is a simple case in which the time for filing a lien affidavit expired and no other facts existed to place a purchaser on notice of the need to make further inquiry into unpaid construction bills.

Scott & Reid's real estate expert offered an opinion about how a prudent purchaser would protect itself from unfiled liens. Specifically, he states that he would advise a purchaser to make inquiry into unpaid construction bills if there has been construction within fewer than six months of the purchase. The only thing the expert pointed to that would have prompted a purchaser to make further inquiry regarding Scott & Reid's construction claims, however, was the recent construction on the premises. As already noted, the expert's view that such precautionary measures are advisable is an opinion as to what steps a purchaser should take "to really be sure . . . ." that there is "no way that any liens can be filed;" *See* Dkt. No. 77, Exh. 9, at 10:22 & 12:11. It is not, however, an opinion purporting to establish when a purchaser has an actual duty to make such inquiry prior to purchase if the statutory period for filing a lien has expired. *See id.* at 19 (conceding that absent "facts to point out to a bona fide purchaser the possible existence of a Constitutional lien, then a purchaser of real property in Texas does not have a duty to first make an inquiry regarding the existence of a Constitutional lien."). Scott & Reid's expert opines that purchasers should make inquiry into possible liens whenever construction is less than 6 months old. He does not contend that a valid lien affidavit can be filed up until 6 months after the completion of work; instead, he uses 6 months as a benchmark because it provides a margin of error in the event the purchaser misjudges the work completion date. Although it may be sensible for an attorney to advise his clients to allow for a margin of error, a hypothetical bona fide purchaser's duty to inquire about possible liens ought not be enlarged to encompass such precautionary measures.

The expert further explained that when he represents a purchaser who does not obtain title insurance, *he* (the expert) requires the seller to provide, at least, a seller's affidavit stating that all construction and labor bills that could give rise to liens (including unrecorded liens) have been paid in full. Second Decl. at ¶ 7. This may be relevant to the standard of care applicable to a real estate attorney advising a purchaser on how best to protect against the prospect of hidden liens, but it does not demonstrate a *duty of inquiry* on the part of the purchaser. As noted already, a purchaser has no duty of inquiry to engage in "exhaustive inquiry or investigation of speculation and conjecture." *In re Spring Creek Invs.,* 71 B.R. at 160.

In any event, the expert acknowledged on deposition (and Scott & Reid's counsel

conceded at oral argument) that rather than insisting on an affidavit stating that there are no liens, a purchaser might instead rely on a warranty in the contract of sale representing that there are no encumbrances. Such a warranty would not put the purchaser on notice that a lien actually exists.[7]

*Argument That Inquiry Notice Would Arise Incident to the Purchaser's Obtaining Title Insurance.* Scott & Reid's expert acknowledges that purchasers do not always obtain title insurance. See Second Decl. at ¶ 7. Accordingly, Scott & Reid's expert's opinion as to what would come to light incident to obtaining title insurance is irrelevant.

Specifically, the expert opines that without proof of payment of all subcontractors and contractors in full, a title insurer will make an exception in its standard owner title insurance policy for various liens, including the constitutional mechanic's lien. Second Decl. at ¶ 6. He then opines that:

> Prudent counsel for a purchaser will always reject such an exception and will require that the title company obtain proof from the Seller that bills for labor and materials have been paid prior to closing. Such proof would be in the form of an Affidavit [from the Seller], lien waivers and an affidavit from the general contractors on the construction project (each a "Contractor's Affidavit") stating under oath that the contractor giving the Contractor's Affidavit and all

subcontractors who provided labor and materials under the general contractor contract with the owner of the project have been paid in full.

*Id.* When, as here, the time under Texas Property Law § 53.052(a) for the contractor's filing of a lien affidavit has expired, it is irrelevant whether a title insurer would make an exception, and whether a "prudent attorney" would insist on the title insurer removing the exception by obtaining a "Contractor's Affidavit." Regardless of what a title insurer would do, the statute provides a bright-line period of constructive notice obviating the need for a purchaser to engage in an endless search to ferret out unrecorded, automatic constitutional liens whose filing would be untimely. A purchaser could speculate that there are unrecorded liens for work that was completed on a date that would make the filing of a lien affidavit untimely, but the Texas doctrine of inquiry notice does not impose a duty on a purchaser to chase down every speculative possibility.

*Argument That a Purchaser Would Inquire re Unpaid Liens Because it Would be Assuming NETtel's Obligation to Pay Such Liens.* Scott & Reid notes that the purchaser would be obligated under the terms of the Lease Agreement to assume all of NETtel's obligations under the Lease Agreement. One of NETtel's obligations was to "promptly pay" for any "work performed" on the premises "if any

---

7. The warranty would not amount to granting the purchaser a perfected lien on NETtel assets. Accordingly, it would not amount to the debtor's giving up value diminishing the estate, which might cast doubt on the propriety of looking to the possibility of such a warranty as showing that there was no new value given by Scott & Reid in releasing the constitutional lien. The warranty would not give rise to a claim against the estate because the constitutional lien would be ineffective against the purchaser. Even if NETtel had

sold the leasehold interest to an actual purchaser against whom the constitutional lien *was* effective (because the purchaser stumbled upon some fact putting it on actual or inquiry notice), such a warranty would give the purchaser (upon paying Scott & Reid for the amount the trustee recovers from Scott & Reid) only a non-priority unsecured claim against the estate in substitution of Scott & Reid's unsecured claim against the estate (arising from the trustee's recovery from Scott & Reid).

mechanic's or materialman's lien is filed or claimed against the Premises or Building." This lease provision is not a fact generating uncertainty about whether NETtel's leasehold interest was unencumbered, such as to put the purchaser to a duty, running in favor of Scott & Reid, to ascertain whether Scott & Reid remained unpaid. It does not tell the purchaser that Scott & Reid is claiming a lien. Moreover, a purchaser ought to be allowed (absent knowledge of some fact putting it on notice) to rely on the recordation statute: a purchaser would be reasonable in assuming that, there being no timely filed lien on file, there were no unpaid bills, and that the recordation statute protects it unless there were some fact known to it suggesting that it ought to inquire further. A purchaser might conclude that any untimely lien would be unenforceable against its leasehold interest, and as such, would not be a lien against the leasehold interest within the meaning of the Lease Agreement, and the purchaser would not be obligated to pay that as a lien filed or claimed against the leasehold interest.

That a purchaser *might* make inquiry as to such liens is speculation, and does not demonstrate that a purchaser necessarily would have made such inquiry. Again, the safest way to guard against the constitutional lien is to make sure that there are no unpaid bills, but when there is no fact putting the purchaser to a duty to inquire whether bills remain unpaid, Texas law does not require a purchaser to make inquiry on the basis that such inquiry would be the safest thing to do.

### D

■ For all of these reasons, I conclude that a hypothetical purchaser would not have had either constructive or inquiry notice of Scott & Reid's unrecorded lien, and would thus take title of NETtel's leasehold interest free and clear of Scott & Reid's constitutional lien. Accordingly, there was no "new value" conferred upon the debtor, and the trustee is thus entitled to summary judgment in his favor. In addition, as discussed below, the trustee is entitled to summary judgment on the alternative ground that there was no mutual intention that NETtel's payment was made in exchange for a release of Scott & Reid's constitutional lien.

### V

To prevail on a § 547(c)(1) defense to the trustee's avoidance power, Scott & Reid must show that NETtel's payment to Scott & Reid was "intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor." 11 U.S.C. § 547(c)(1)(A).

### A

■ Section 547(c)(1) is not satisfied by only showing that a payment to a creditor contemporaneously resulted in new value being extended (here, the release of an allegedly unavoidable lien). Additionally, the creditor must show that the payment was *intended* to be in exchange for such new value.

■ As stated in *In re Mason*, 189 B.R. 932, 936 (Bankr.N.D.Iowa 1995):

The requirement that the parties intend a contemporaneous exchange codifies the rule in *National City Bank of New York v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). *Rutledge v. First National Bank of Sallisaw, Oklahoma (In re Carson)*, 119 B.R. 264, 267 (Bankr.E.D.Okla.1990); 4 Collier on Bankruptcy ¶ 547.09 at 547–50. In *Hotchkiss*, the creditor made an unsecured loan to a securities broker. Later the same day, the creditor learned the debtor was in financial difficulty and

demanded security for its loan. The parties had not originally intended to make a secured loan. The court held that the transfer was avoidable as a preference.

This case is not quite like *Hotchkiss* where the creditor exchanged value to the debtor *before* the debtor transferred security. Here, the release of Scott & Reid's allegedly unavoidable constitutional lien effected by NETtel's payment came *after* the payment was made (or, perhaps more accurately, was effected upon the payment being made), and it would seem that if Scott & Reid gave up an unavoidable constitutional lien, the estate was not harmed even if the parties were unaware of the constitutional lien. Nevertheless, § 541(c)(1) is clear and unambiguous: the debtor and the creditor must have intended the debtor's payment to be in exchange for new value. The debtor's intent is generally irrelevant in establishing a preference; a trustee is not required to show that the debtor intended to prefer the transferee-creditor over other creditors. Section 541(c)(1), however, requires an affirmative showing of an intention on the debtor's and the creditor's part for the debtor to receive new value (the opposite of intending to confer a preference). In determining whether there was such an intention, courts look to the circumstances surrounding the transaction. *Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.)*, 306 B.R. 243, 249 (8th Cir. BAP 2004), *aff'd*, 394 F.3d 1082 (8th Cir.2005).

At this stage in the litigation, after discovery has been completed, it is Scott & Reid's burden to provide evidence that would permit a reasonable finder of fact to conclude that, when payment was made, Scott & Reid and NETtel intended the payment to be made in exchange for Scott & Reid's release of its constitutional lien. Scott & Reid has failed to satisfy this evidentiary burden, and thus § 547(c)(1) does not apply.

**B**

By an invoice dated May 3, 2000, Scott & Reid sought payment of the entire amount specified under the Purchase Order. NETtel did not pay the invoice within 30 days of receipt. By August 10, 2000, NETtel's landlord had learned of NETtel's failure to pay the Invoice. Scott & Reid had done previous jobs and was doing other jobs in the Addison Road building, and NETtel's landlord was one of its clients. Apparently in an effort to get help prodding NETtel to make payment, Scott & Reid informed Cheryl Hollowell of the landlord's office regarding NETtel's being delinquent in paying its bill. She apparently suggested that Scott & Reid send the bill to NETtel anew telling NETtel that it was being sent at her request, for on August 10, 2000, Douglas Scott of Scott & Reid sent a fax to Jimmy Ellis of NETtel "RE: Past Due Money'" stating "Attached is the billing information Cheryl Hollowell asked me to send to you. Call me if you have any questions." An August 22, 2000 fax from Selina Skinner of Scott & Reid to Jimmy Ellis of NETtel informed Mr. Ellis that the invoice was 70 days past due, then read:

> We have contacted Cheryl Hollowell with the Red Sea Management Group [NETtel's landlord] on behalf of this invoice and have informed her that if we do not receive payment on this invoice before the end of the month we will have no other choice but *to place a lien on the building.* This will cause great distress for *the building owner* as well as Scott & Reid. In order *to avoid this situation,* we ask that you pay immediate attention to this matter.

(Dkt. No. 76, Exhibit D) (emphasis added). NETtel tendered payment shortly thereafter. No other communications of relevance took place regarding payment of the outstanding invoice. NETtel's Ellis did not know of the existing constitutional lien, and did not know whether Scott & Reid could place a lien on the landlord's ownership interest. There is no evidence that anyone else at NETtel had any such knowledge.

### C

In examining the parties' intentions, one must necessarily first inquire into the meaning of the August 22, 2000 fax. The language of that fax does not show that Scott & Reid was asking NETtel to make payment in exchange for a release of Scott & Reid's constitutional lien. First, the fax expresses an intent "to place a lien;" this language, indicating that action would be taken to cause a lien to be placed on the building, is inconsistent with the assertion of a lien under the Texas constitution, which is automatically held by the contractor.

Second, the fax discussed Scott & Reid's having contacted NETtel's landlord and telling the landlord that if NETtel does not make payment Scott & Reid will have no choice other than to place a lien "on the building," meaning the landlord's building. Scott & Reid's constitutional lien was against NETtel's leasehold interest, not the building itself. The landlord would be unaffected by the constitutional lien on NETtel's leasehold interest, but there is no evidence that NETtel understood that to be the case.

Third, the fax threatens "great distress" for the "building owner." Again, the constitutional lien was against NETtel's leasehold interest.

Fourth, even if the threat to place a lien on the landlord's building, causing great distress "for the building owner," could somehow be read as meaning placing a lien on NETtel's leasehold interest, the language cannot be reasonably interpreted to be a threat that Scott & Reid intended to "file an affidavit of the constitutional lien to record it" pursuant to Texas Property Code § 53.052(a). Because the constitutional lien is self-executing as between the original contractor and the owner (here, the owner of the leasehold, NETtel) and an affidavit need only be filed to protect against third parties, it would make little sense to interpret, in a fax to NETtel, the language "plac[ing] a lien" to mean the filing of an affidavit, because the filing of an affidavit would be of little concern to NETtel, who would be subject to the lien regardless of such a filing. Finally, the plain meaning of the language used—"to place a lien"—does not imply or suggest that what Scott & Reid really meant was that Scott & Reid would be "perfecting its [constitutional] lien" or "filing an affidavit" to do so.

The fax, as Scott & Reid suggests, does provide a stick-and-carrot scheme; however, the stick is clearly the threat of placing a lien against the landlord's building, and the carrot is refraining from doing so if payment is made. If the payment was made in response to this threat of placing a lien on the landlord's building, and thus the "value" exchanged was Scott & Reid's forbearance from carrying out that threat, such value had nothing to do with Scott & Reid's constitutional lien on NETtel's leasehold interest, and does not qualify as "new value" under 11 U.S.C. § 547(c)(1)(A). Under § 547(a)(2), "new value" is defined, in pertinent part, as a "release ... of property previously transferred." Legal remedies a creditor has that might coerce payment cannot be said to be property "previously transferred" and thus forbearance from exercising

those legal remedies in exchange for payment from the debtor is not an exchange for new value. *See Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1159 (D.C.Cir.1986) (where forbearance by an undersecured creditor of its right to foreclose on collateral could not constitute "new value.") If "new value" encompassed forbearing from legal remedies to coerce payment of a debt, "the preference provisions of the bankruptcy code would be nullified, because all creditors could extract payments within the preference period under [the 'new value'] exception." *Id.* Nothing communicated to NETtel suggested to NETtel that there was already a previous transfer of a property interest to Scott & Reid that would be released via a payment to Scott & Reid. Accordingly, there could be no intention on NETtel's part to make its payment in exchange for such a release. *See Silver v. Avnet, Inc. (In re Silver)*, 130 B.R. 329, 331 (Bankr.D.N.M.1991) (in making payment, the debtor "could not have *intended* to obtain the release of the judgment lien on his property, when he did not know of its existence" (emphasis in original), and thus the requirement of § 547(c)(1)(A) that the payment have been intended by the debtor as an exchange for new value was not met). *See also Official Plan Comm. v. Expeditors Int'l of Wash., Inc. (In re Gateway Pac. Corp.)*, 153 F.3d 915, 918 (8th Cir.1998) (intention lacking when there had been no discussion of any existing security interest).

To avoid a finding that intent was lacking, Scott & Reid makes a valiant effort to provide a *post hoc* rationalization for how the language of the fax could be construed (1) to relate to a constitutional lien, and (2) to propose an exchange of payment for release of that lien. Scott & Reid cites case law to support the idea that parties rarely state their precise intent or attach legal descriptions to their activities. Although that is no doubt true, the language of the fax is not unclear or imprecise. The fax clearly threatens to obtain a lien against the building if payment is not made; the fax is a run-of-the-mill, pay-or-face-the-consequences threat, and makes no reference to any offer to release the already-existing constitutional lien if payment is rendered.

Scott & Reid cites *Rollins v. Neilson (In re Cedar Funding, Inc.)*, 398 B.R. 346, 354 (Bankr.N.D.Cal.2008), for the proposition (not supported by that decision) that parties may undertake an exchange of new value even if they do not (or cannot) precisely understand the legal status of the value being exchanged. One issue in that declaratory judgment proceeding was whether an assignment to the plaintiffs of a deed of trust was avoidable as a preference. In opposing the trustee's motion to dismiss, they argued that § 547(c)(1) applied because they exchanged their equitable lien on the deed of trust for the legal interest conveyed by the assignment. The trustee argued that the plaintiffs were unaware of their equitable lien until the assignment had been made, and thus there could not be an intent to engage in a contemporaneous exchange. Even though the plaintiffs were unaware of their equitable lien until they received a copy of the assignment,[8] under California law they could have rejected the assignment and retained their equitable lien. Thus, the act of not rejecting the assignment, and the act instead of accepting it, could be

---

8. The plaintiffs had been told that an assignment of a deed of trust would be executed and filed in their favor years earlier, 398 B.R. at 349, and on the face of the complaint were entitled to an equitable lien on the property.

*Id.* at 350–51. Having thought that the assignment had been recorded years earlier, they were unaware of their equitable lien until they received the recorded assignment.

viewed as intended under § 547(c)(1) to be an exchange of their equitable lien for the legal interest effected by the assignment. The court denied the trustee's motion to dismiss, and cautioned that at trial the plaintiffs "will have to offer proof not only that they intended to exchange an equitable lien for a recorded lien, but also that [the debtor] intended such an exchange." *Id.* at 354–55.

In contrast to *In re Cedar Funding*, the motion here is not a motion to dismiss, but one for summary judgment. Thus, I am not considering whether there is a plausible way alleged in which NETtel's payment could be intended to be in exchange for new value, but rather whether there is evidence which would permit a reasonable finder of fact to determine that the parties intended such an exchange. Here, the parties did not refer to a lien in an imprecise manner that could include a constitutional lien; the plain language of the fax could not be construed as referring to a constitutional lien. The only evidence provided regarding the parties' communications uses language that excludes the possibility of the parties intending to exchange payment for release of a constitutional lien.

## D

Even if the court accepted Scott & Reid's unique interpretation of what it intended to express in the fax which, as discussed above, is not supported by the clear language of the fax, Scott & Reid has provided no evidence to indicate that NETtel shared that interpretation. The plain language of the fax would not lead a reasonable person to think that Scott & Reid proposed to exchange payment for release of its constitutional lien, and there is no evidence NETtel thought Scott & Reid was making such a proposal. When faced with a serious threat of a lien being placed on its landlord's building, NETtel tendered payment. This is exactly the type of pre-petition payment that is avoided as a preference under the Bankruptcy Code when made within 90 days before filing to protect other creditors and prevent what would otherwise result in a rush of creditors to the door of any debtor they felt might be considering bankruptcy. *See Drabkin*, 800 F.2d at 1159.

The additional evidence presented by the parties weighs against a finding that the parties intended a new-value exchange. Jimmy Ellis (James C. Ellis), who served as NETtel's Senior Director of Corporate Real Estate, testified on deposition that, at the time the August 22, 2000 fax was sent to him, he had no knowledge of lien law in Texas; no one from Scott & Reid discussed the release of a lien or Texas lien law with him in connection with that letter; and, he did not recall any communications concerning liens with anyone from Scott & Reid aside from the August 22, 2000 fax. (Dkt. No. 77, Exhibit 7, 8:17–21; 42:11–15; 46:8–13, 15–18). Mr. Ellis remembered seeing the fax near the time it was received, but he had no knowledge of why payment was made on the account. (*Id.,* 36:14–19; 40:1–6.) There being no evidence that anyone in NETtel knew about the existence of the constitutional lien, and there being no evidence that the parties discussed payment being in exchange for release of an existing constitutional lien, the August 22, 2000 fax must be viewed as a threat of steps being taken to place a lien on the landlord's building, rather than an intended exchange for release of an automatic constitutional lien already in existence and not mentioned in the fax.

Mr. Ellis had no knowledge of Texas mechanics and materialmen lien law, but he was aware of NETtel's obligation, as tenant, to make sure that no such liens were placed on the property as the result

of construction work, he knew that a contractor's putting a mechanic's lien against the building is something to be avoided, and he understood that with any contractor, NETtel always gets a release of lien at the end of the project. (*Id.*, 33:2–17; 42:16–22; 43:1–10.) This, however, does not establish that NETtel intended the payment to Scott & Reid to release a constitutional lien, already in existence, of which Ellis had no knowledge.

Moreover, there is no evidence indicating that the payment to Scott & Reid was prompted by Scott & Reid's threat of placing a lien on the landlord's building: Ellis knew that the work had been completed, that Scott & Reid's bill had been approved in his section by Bob Taylor for payment, and that in August 2000 he discussed with management which of the various outstanding bills were legitimate, meaning that the work was complete and finalized, but he did not otherwise know why the payment was made to Scott & Reid on August 31, 2000. (*Id.*, 40:1–42: 3.)

Even if the payment *was* in response to Scott & Reid's threat of placing a lien on the landlord's building, that would indicate an intent to eliminate the fixing of a future lien. As Scott & Reid acknowledges, *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 401 (5th Cir.2005), holds that payment of a debt for which a lien could be fixed on property does not come within the exception of 11 U.S.C. § 547(c)(6) for "the fixing of a statutory lien that is not avoidable under section 545." Such a lien, not already in existence, would similarly not be a basis for invoking § 547(c)(1).

Both parties cite to the February 27, 2009 deposition of Nicholas Goettsch. Mr. Goettsch explained that the threat to place a lien on the building was an expression that, if payment was not made, "we'll send the contract and everything down to our attorneys." (Dkt. No. 76, Exhibit B, 20:6–8.) Mr. Goettsch further affirmed that no one within Scott & Reid records liens, and "[a]ttorneys do all our liens." (*Id.*, 20:14–16.) At the least, Mr. Goettsch's testimony lends no support to the proposition that Scott & Reid knew that it had a constitutional lien, or to its contention that "plac[ing] a lien on the building" was or could be interpreted by the parties to mean Scott & Reid would pursue its constitutional lien on NETtel's leasehold interest. Scott & Reid has given no evidence indicating that release from a constitutional lien was intended by the parties.

**E**

■ Scott & Reid also argues that, because a person is presumed under Texas law to know the law, NETtel and Scott & Reid, at the time of the payment, are deemed to have been aware that Scott & Reid held a constitutional lien. Opp. to Trustee's Mtn. for S. Jdgt. at 7–8. From this, Scott & Reid extrapolates that both parties, although they did not *actually* intend to exchange payment for the release of the constitutional lien, can be *presumed* under Texas law to have intended it, citing *French v. Gill*, 252 S.W.3d 748, 756 (Tex. App.2008). (*Id.*) There are two flaws in this argument.

First, *French v. Gill* addressed a question of Texas law (a tolling exception to a state statute of limitations) not a question of federal law, and the issue is whether, as a matter of federal law, NETtel and Scott & Reid are deemed to have had actual knowledge of the constitutional lien based on the maxim that a person is presumed to know the law. I am not bound to follow Texas law in deciding the question of intent under § 547(c)(1).

Second, *French v. Gill* is distinguishable because it applied the maxim to a situa-

tion in which a party had a duty to ascertain the law. It held that the plaintiffs' misunderstanding of the federal diversity jurisdiction statute was immaterial to determining whether they intentionally disregarded proper jurisdiction in having sued the defendants initially in federal court, as the plaintiffs were charged with knowledge of the federal statute's provisions because all persons are presumed to know the law. When a plaintiff pursues litigation in federal court, the Texas courts could decide, there is an intentional disregard of proper jurisdiction if the plaintiff fails in her duty to apprise herself of the applicable law governing jurisdiction. There was no duty here for NETtel to research whether Scott & Reid had a constitutional lien as a matter of law. Accordingly, the issue under Texas law of intentional disregard of proper jurisdiction bears no resemblance to the issue of intent under § 547(c)(1). In applying the requirement of intent under § 547(c)(1), it makes no sense to deem the parties to have intended anything with respect to a lien of which they had no actual knowledge based on the maxim that a person is presumed to know the law.

### F

Based on the foregoing, there is no reasonable basis upon which a finder of fact could view NETtel's payment to Scott & Reid as intended to be an exchange of new value under 11 U.S.C. § 547(c)(1).

### VI

Because NETtel's payment to Scott & Reid was not an exchange of new value or, alternatively, because the payment was not intended to be an exchange of new value, Scott & Reid's § 547(c)(1) defense fails, and the payment made to Scott & Reid is voidable. The trustee is entitled to entry of a judgment for a recovery in the amount of $129,508.36 from Scott & Reid, plus any prejudgment interest that may be awarded, and costs (to be sought by a bill of costs filed within 21 days after entry of the judgment), with interest to run on the total judgment amount from the date of entry of the judgment as provided by 28 U.S.C. § 1961. The trustee's complaint requested prejudgment interest, but his motion for summary judgment failed to address the issue of prejudgment interest. Accordingly, it is

ORDERED that Scott & Reid's renewed motion for summary judgment is denied. It is further

ORDERED that the trustee's renewed motion for summary judgment is granted, and the transfer by the debtor to Scott & Reid of $129,508.36 on August 31, 2000, is avoided. It is further

ORDERED that within 15 days after entry of this Memorandum Decision and Order, the parties shall either file a stipulation of an agreed disposition of the trustee's request for inclusion of prejudgment interest in the forthcoming judgment, or file memoranda addressing the issue of prejudgment interest (including any calculation of the amount of such interest).